## WALLING, ADMINISTRATOR OF THE WAGE AND HOUR DIVISION, U. S. DEPARTMENT OF LABOR, *v.* HELMERICH & PAYNE, INC.

No. 27. Argued October 17, 1944.—Decided November 6, 1944.

*Mr. Irving J. Levy,* with whom *Solicitor General Fahy* and *Messrs. Ralph F. Fuchs, Douglas B. Maggs,* and *Harry M. Leet* were on the brief, for petitioner.

*Mr. Eugene O. Monnet,* with whom *Messrs. Frank Settle* and *Sam Clammer* were on the brief, for respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

We are concerned here with the question whether certain provisions of employment contracts relating to the

computation and application of regular and overtime wage rates conform to the requirements of § 7 (a) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. § 201 *et seq.*

Respondent is engaged in the production of oil and gas for interstate commerce and its employees admittedly are covered by the Act. Prior to October 24, 1938, the effective date of the Act, certain of respondent's employees worked 8-, 10- and 12-hour daily shifts, or "tours," and were paid a specified wage for each tour. These wages were in excess of the minimum required by the Act, though the number of tours per week would often cause an employee to work more than the maximum hours allowed by the Act without overtime pay being required.

In order to maintain the same wage levels after the Act became effective, respondent made new employment contracts with the employees in question whereby they received their wages under the so-called "Poxon" or split-day plan. This plan arbitrarily divided each regular tour into two parts for purposes of calculating and applying hourly wage rates. The first four hours of each 8-hour tour, the first five hours of each 10-hour tour and the first five hours of each 12-hour tour were assigned a specified hourly rate described as the "base or regular rate." The remaining hours in each tour were treated as "overtime" and called for payment at one and one-half times the "base or regular rate." The contracts then recited that the "base rate" set forth "shall never apply to more than 40 hours in any work week."

These so-called "regular" and "overtime" hourly rates were calculated so as to insure that the total wages for each tour would continue the same as under the original contracts,[1] thereby avoiding the necessity of increasing

---

[1] Thus the rotary helpers employed by respondent formerly received $7 for each eight hour tour. Under the split-day plan, they received a "regular rate" of 70 cents an hour for the first four hours

wages or decreasing hours of work as the statutory maximum workweek of 40 hours became effective.[2] Only in the extremely unlikely case where an employee's tours totalled more than 80 hours in a week[3] did he become entitled to any pay in addition to the regular tour wages that he would have received prior to the adoption of the split-day plan. Until more than 80 hours had been worked the plan operated so that the employee could not be credited with more than 40 hours of "regular" work, the remaining time being denominated "overtime." Hence, since the wages under the old system and under the split-day plan were identical, the original tour rates could be used as the simple method of computing wages for each pay period. The actual and regular workweek was accordingly shorn of all significance.

The District Court and the Circuit Court of Appeals both held that the split-day plan of compensation, under the decision of this Court in *Walling* v. *Belo Corp.,* 316 U. S. 624, did not violate the provisions of § 7 (a) of the Fair Labor Standards Act. We cannot agree.

Section 7 (a) limits to 40 a week the number of hours that an employer may employ any of his employees subject to the Act, unless the employee receives compensation for his employment in excess of 40 hours at a rate "not less than one and one-half times the regular rate at which he is employed." The split-day plan here in issue satisfies neither the purpose nor the mechanics of this requirement.

---

of each tour and an "overtime" rate of $1.05 for each of the remaining four hours. This totalled $7 for the tour.

[2] During the first year after the effective date of the Act the maximum was 44 hours; during the second year 42 hours; and thereafter 40 hours.

[3] For an employee working on 12-hour tours, it was necessary to work at least 96 hours per week before becoming entitled to increased wages under the split-day plan.

As we pointed out in *Overnight Motor Co.* v. *Missel,*
316 U. S. 572, 577–578, the Congressional purpose in en-
acting § 7 (a) was twofold: (1) to spread employment by
placing financial pressure on the employer through the
overtime pay requirement, see also *Southland Gasoline
Co.* v. *Bayley,* 319 U. S. 44, 48; and (2) to compensate
employees for the burden of a workweek in excess of the
hours fixed in the Act. Yet neither objective could be
attained under the split-day plan. It enabled respondent
to avoid paying real overtime wages for at least the first
40 hours worked in excess of the statutory maximum
workweek, thus negativing any possible effect such a pay-
ment might have had upon the spreading of employment.
And the plan was so designed as to deprive the employees
of their statutory right to receive for all hours worked
in excess of the first regular 40 hours one and one-half
times the actual regular rate. The statutory maximum
workweek of 40 hours was by contract twisted into an 80
hour maximum workweek. No plan so obviously incon-
sistent with the statutory purpose can lay a claim to
legality.

The split-day plan, moreover, violated the basic rules
for computing correctly the actual regular rate contem-
plated by § 7 (a). While the words "regular rate" are
not defined in the Act, they obviously mean the hourly
rate actually paid for the normal, non-overtime work-
week. *Overnight Motor Co.* v. *Missel, supra.* To com-
pute this regular rate for respondent's employees, assum-
ing the same wages and tours, required only the simple
process of dividing the wages received for each tour by
the number of hours in that tour.[4] This regular rate was

---

[4] In this case the weekly wage divided by the number of hours
actually worked in the week would have yielded the same regular rate.
Under either computation, a rotary helper being paid $7 for each
eight-hour tour was receiving 87½ cents per hour. This was his regu-
lar rate regardless of the number of tours per week. That rate was
applicable to the first 40 hours regularly worked, or to the first five

then applicable to the first 40 hours regularly worked on the tours and the overtime rate (150% of the regular rate) became effective as to all hours worked in excess of 40.

But respondent's plan made no effort to base the regular rate upon the wages actually received or upon the hours actually and regularly spent each week in working. Nor did it attempt to apply the regular rate to the first 40 hours actually and regularly worked. Instead the plan provided for a fictitious regular rate consisting of a figure somewhat lower than the rate actually received. This illusory rate was arbitrarily allocated to the first portion of each day's regular labor; the latter portion was designated "overtime" and called for compensation at a rate one and one-half times the fictitious regular rate. Thus when an employee on regular eight-hour tours had actually worked 40 hours, respondent could point to the employee's contract and claim that he had worked only 20 "regular" hours and 20 "overtime" hours. Hence he was entitled to no additional remuneration for work in excess of 40 hours except in the unlikely situation, which never in fact occurred, of his actually working more than 80 hours. The vice of respondent's plan lay in the fact that the contract regular rate did not represent the rate which was actually paid for ordinary, non-overtime hours, nor did it allow extra compensation to be paid for true overtime hours. It was derived not from the actual hours and wages but from ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale.[5]

---

tours. For all hours in excess of 40, the rotary helper was entitled to one and one-half times that rate, or $1.31¼. We, of course, express no opinion as to the proper computation of the regular rate under other circumstances. Nor do we intend to indicate that the formula we have used as satisfying the statutory requirements is the only one which respondent could adopt as complying with them.

[5] In paragraph 70 (4) of Interpretative Bulletin No. 4, as revised in November, 1940, the Administrator expressed his opinion that a

42

It is no answer that the artificial regular rate was a product of contract or that it was in excess of the statutory minimum. The Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected. But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes. Even when wages exceed the minimum prescribed by Congress, the parties to the contract must respect the statutory policy of requiring the employer to pay one and one-half times the regular hourly rate for all hours actually worked in excess of 40. Any other conclusion in this case would exalt ingenuity over reality and would open the door to insidious disregard of the rights protected by the Act.

Nothing in this Court's decision in *Walling* v. *Belo Corp., supra,* sanctions the use of the split-day plan. The controversy there centered about the question whether the regular rate should be computed from the guaranteed weekly wage or whether it should be identical with the hourly rate set forth in the employment contract. There was no question, as here, pertaining to the applicability of the regular rate to the first 40 hours actually and regularly worked, with the overtime rate applying to all hours worked in excess thereof.

One final point remains. Petitioner here filed a complaint in the District Court seeking, in part, an injunction to compel respondent to cease its use of the split-day contracts. Two months after the complaint was filed, but

plan similar to that of respondent's did not conform to the Act. While this opinion is not binding on the administration of the Act, it does "carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 580–581, n. 17.

before the case came on for trial, respondent discontinued the use of these contracts and substituted different compensation plans not now before us. The District Court, however, denied the injunction on the merits insofar as the split-day contracts were concerned, and the court below affirmed on a like basis. 138 F. 2d 705. In granting certiorari upon the question of the legality of the split-day plan we asked for a discussion of the question whether respondent's discontinuance of the plan rendered the case moot. 321 U. S. 759. We hold that the case is not moot under these circumstances. Despite respondent's voluntary cessation of the challenged conduct, a controversy between the parties over the legality of the split-day plan still remains. Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power. See *Hecht Co.* v. *Bowles,* 321 U. S. 321, 327; *Otis & Co.* v. *Securities & Exchange Commission,* 106 F. 2d 579, 583–584. Respondent has consistently urged the validity of the split-day plan and would presumably be free to resume the use of this illegal plan were not some effective restraint made. There is thus "an actual controversy, and adverse interests," *Lord* v. *Veazie,* 8 How. 251, 255, with a "subject-matter on which the judgment of the court can operate," *Ex parte Baez,* 177 U. S. 378, 390; *St. Pierre* v. *United States,* 319 U. S. 41, 42.

We accordingly reverse the judgment of the court below with directions to remand the case to the District Court for further proceedings in conformity with this opinion.

*Reversed.*