**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. ALASKA PACIFIC CONSOL. MIN. CO.**

No. 10905.

Circuit Court of Appeals, Ninth Circuit.

Dec. 19, 1945.

Douglas B. Maggs, Sol., U. S. Dept. of Labor, Wage & Hr. Div., and Bessie Margolin, Asst. Sol., both of Washington, D. C., Dorothy M. Williams, Regional Atty., and Joseph M. Stone, Atty., both of San Francisco, Cal., for appellant.

James R. Gates and V. A. Montgomery, both of Seattle, Wash., for appellee.

Before DENMAN, BONE, and ORR, Circuit Judges.

ORR, Circuit Judge.

At the time the Fair Labor Standards Act of 1938 [1] became effective, appellee, hereinafter referred to as the Company, put in operation a so-called split shift plan. Appellant, hereinafter referred to as the Administrator, challenging the legality of said plan, brought an action in the District Court seeking to enjoin the Company from operating thereunder. The injunction was refused and the Administrator appeals.

The Company, as its name implies, was engaged in the mining business. It operated a gold mine in the Talkeetna Mountains, 70 miles from Anchorage, Alaska. It is admitted that the employees of the Company are covered by the Fair Labor Standards Act.

Prior to the effective date of the Act the Company employed some of its employees on a daily, or shift, basis and some on a monthly basis. The regular day, or shift, was eight hours. If and when an employee worked more than eight hours he was paid overtime, usually at straight time. In the event a shift of less than eight hours was worked a proportionate deduction was made. Men other than those employed on a daily, or shift, basis were employed on a monthly basis at a definite sum; they were to perform seven 8-hour shifts in a week; if they performed any overtime, they received overtime at straight time, figured on the basis of the regular time.

At the time of the effective date of the Act the Company had considerable concern as to how they could best comply with the requirements of the Act. They were operating in an isolated section. The employees were desirous of working a sufficient time each day to maintain the daily and monthly wages theretofore received. Conditions at the mine made it impera-tive that operations be carried on for seven days a week. The Company well knew that should the hourly wage be fixed so as to reduce the daily wage each man had been receiving that discontent would exist among the men and it is not unlikely that they would have walked off the job. The men were interested in the amount received per shift. To divide the amount then paid for the eight hour day and to fix one-eighth thereof as the hourly wage would result in greatly increased cost of operations. As an example we may take a miner who, prior to the effective date of the Act, was receiving $5 for an eight hour shift. To divide that amount on an hourly basis would be 62½ cents per hour. If paid on that basis for the first 40 hours he would receive $25; for the remaining 16 hours he would receive time and one-half as overtime, or 93¾ cents per hour; hence, for the 56 hour week which was the usual practice the Company would be compelled to pay $40.10 in place of $35.00, the weekly earning on a straight shift basis. Of course the Company did not desire to grant this increase in wages. The men were satisfied with the wages they were receiving under the daily eight-hour shift and monthly plans in operation before the effective date of the Act. The Company, in order to maintain the status quo, devised and put in operation its so-called 6-2 plan. The eight-hour shift was divided into 6 hours straight time at a given amount per hour and the remaining two hours were considered overtime. Thus, in each week of seven days the employee worked so-called 42 hours straight time and 14 hours overtime for the same wage he had received before the Act went into effect. An elaborate algebraic formula was devised in order to create this plan. However, the results obtained were those above outlined. The normal work day was not reduced; the amount paid per day and per month remained the same.

The Company provided board and lodging to the men living at the property and an amount equal thereto was paid to employees living off the property.

During part of 1941 the Company hired approximately 20 men to drive a tunnel known as the "water tunnel". These men were paid a guaranteed daily wage of $10, plus a production bonus at a specified rate per foot in excess of a 15-foot daily average. The $10 daily payments were split

---

[1] 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

on the Company's books into "regular" and "overtime" hourly rates, apparently chosen at random and designed, when added together, for six hours "regular time" and two hours "overtime" to equal $10 per day. The tunnel was completed in 1941, prior to the institution of the instant suit and this compensation system was not used thereafter.

In 1942 additional tunnel construction was begun and paid for on a piece work basis at an agreed sum per foot. This work resulted in average daily earnings of $15 per man. In their contracts with the Company for this project the men agreed, and the Company guaranteed, that their base pay was to be at least 40 cents an hour for 40 regular hours and 60 cents an hour for 16 overtime hours, but that they should have as much more than that as they were able to earn. The men were limited to 56 hours work per week.

These employees received board and lodging in addition to their cash earnings. Shortly before this action was begun the Company made specific agreements with each employee that instead of being considered additional overtime as in the past the board furnished should be charged against their weekly earnings.

The lower court did not rule on the validity of the system of compensating employees engaged in the water tunnel construction since it found the tunnel was completed before this action began and that that compensation system was not thereafter used. The lower court also failed to rule on whether the cost of board and lodging furnished by the Company to employees must be included in determining their regular rates of pay.

■ Since the District Court's decision, the Supreme Court has declared a "split day" plan virtually identical to the one under consideration here (there the division was 4-4, here it was 6-2) to be a violation of Section 7 of the Act, 29 U.S.C.A. § 207.[2] The Supreme Court, in condemning the "split day" plan stated that the words "regular rate" as used in the Act mean the hourly rate actually paid for the normal non-overtime workweek. The vice in the Company's plan, as in the plan condemned by the Helmerich case,[3] was that it did not base the regular rate upon the wages received, nor upon the hours ac-

tually spent in the normal non-overtime week, nor was the regular rate paid for the first forty hours actually worked. The Company's "regular" rate was derived "not from the actual hours and wages but from ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale." [4]

The lower court relied upon the decision in the Helmerich case as decided by the Tenth Circuit Court of Appeals,[5] which was reversed by the Supreme Court,[6] and on Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. The Supreme Court distinguished the Helmerich case from the Belo case on the ground that in the Belo case the question of the applicability of the regular rate to the first forty hours actually and regularly worked was not involved. There is language in the Belo case which would support the Company's contentions, but, as the Seventh Circuit Court of Appeals said recently in Walling v. Uhlmann Grain Company, 151 F.2d 381, 383:

"If the Supreme Court has not repudiated its holding in the Belo case, it has come so close as to leave no room for its application except upon an identical state of facts."

Here the normal workday was not six hours. It was an 8-hour shift and the Company and the men intended that it remain so. It was essential that the mine be kept in operation seven days a week, 24 hours a day.

The case of Walling v. Youngerman Reynolds Hardware Co., 325 U.S. 419, 65 S.Ct. 1242, strengthens our conclusion that the "split day" plan put in operation by the Company violates Section 7(a) of the Act. In the Youngerman case the Supreme Court, speaking of the "regular rate," said:

"It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." 325 U.S. 419, 65 S.Ct. 1242, 1245.

■ The Youngerman case, supra, and Walling v. Harnischfeger Corpora-

[2] Walling v. Helmerich and Payne, Inc., 323 U.S. 37, 38, 65 S.Ct. 11.

[3] See Note 2.

[4] See Note 2, p. 14.

[5] 138 F.2d 705.

[6] See Note 2.

tion, 325 U.S. 427, 65 S.Ct. 1246, decided the same day, also establish the illegality of the Company's contracts with employees engaged in driving tunnels. The men who drove the water tunnel received a guaranteed daily wage of $10, plus production bonuses. The guaranteed daily wage was arbitrarily divided into "regular" and "overtime" segments on the Company's books. It seems clear that this "regular" rate, chosen at random, was completely unrelated to the payments actually and normally received each day. Further, it does not appear that the production bonuses entered into the computation of the daily rate. Consequently, the plan of compensating these water tunnel employees violates the Act. This plan is not now in operation, but "voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power."[7] Since the question may arise in future operations we deem it advisable to express our views thereon.

■ The piece work payments for the 1942 tunnel construction likewise appear to be a clear violation of the Act in that the piece rate wages were not used to compute regular and overtime rates. The Company guaranteed a minimum wage, but agreed that it would pay as much over that as the men were able to make on an agreed sum per foot of tunnel completed. On this basis employees averaged $15 a day. Although minimum hourly rates were guaranteed, employees were simply paid their piece rate earnings. These employees received a greater regular rate than the guaranteed minimum base rate and, consequently, these "piece work wages forming only a part of their normal weekly income must also be an ingredient of the statutory regular rate."[8] If it be said that the men received *only* piece work wages, and not the guaranteed minimum *plus* piece work, the result is equally clear.[9]

"Once the parties agree that these employees should receive such piece work wages, those wages automatically enter into the computation of the regular rate for purposes of Section 7(a) regardless of any contract provision to the contrary."[10]

■ Therefore, to determine the regular rate, which is the keystone of the Act, the piece work wages must be translated into an hourly rate. That regular rate should then be applied to the first 40 hours worked, and for all hours worked in addition a rate one and one-half times the regular rate must be paid. Here the piece work rates were for work done during a 56 hour week (the total time the men were permitted to work under the plan), and, as the facts permit no division of these piece work rates into regular and overtime segments, the courts cannot arbitrarily make such a division, thereby creating an artificial compliance with Section 7(a).[11]

■ The same considerations must necessarily decide the question of whether the reasonable cost of board and lodging furnished the employees should be included in computing the regular rates. If piece work wages forming part of the normal weekly income must be an ingredient of the statutory regular rate,[12] it seems clear that the cost of board and lodging customarily furnished employees must also be included in the regular rate, particularly as Section 3(m) of the Act itself specifically provides that "wages" include the reasonable cost of such board and lodging.[13] The Company contends that nothing in the Act prohibits the parties from agreeing that the cost of this board and lodging shall be included as part of the *overtime* compensation. We cannot agree. We must look "not to contract nomenclature" but to all payments, wages, piece work rates, bonuses, or things of value forming part of the normal weekly income to determine the statutory regular rate.

The judgment of the District Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.

---

[7] Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 14.

[8] Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 1249.

[9] United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295.

[10] See Note 8.

[11] See Note 8.

[12] See Note 8.

[13] Section 3(m), 29 U.S.C.A. § 203(m): "(m) 'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." June 25, 1938, c. 676, § 3, 52 Stat. 1060.