### ADDISON et al. v. HURON STEVEDORING CORPORATION.

### AARON et al. v. BAY RIDGE OPERATING CO., Inc.

District Court, S. D. New York.

Jan. 6, 1947

Max R. Simon, and Goldwater & Flynn, all of New York City (Monroe Goldwater, James L. Goldwater, and Joseph E. O'Grady, all of New York City, of counsel), for plaintiffs.

John F. Sonnett, Asst. Atty. Gen., John F. X. McGohey, U. S. Atty., of New York City (J. Francis Hayden, Sp. Asst. to the Atty. Gen., Marvin C. Taylor, Atty., Department of Justice, and Mary L. Schleifer, Labor Law Counsel, War Shipping Admin., both of Washington, D. C., of counsel), for defendant.

RIFKIND, District Judge.

The Fair Labor Standards Act provides: "7(a) No employer shall * * * employ any of his employees * * * for a work week longer than forty hours * * * unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed" 29 U.S.C.A. § 207.

The collective bargaining agreement between the International Longshoremen's Association and the defendants, which governs the employment practices of the plaintiffs and the defendants herein, provided for two classes of compensation: a "straight time" hourly rate and an "overtime" hourly rate. Paragraph 3 of the agreement, in effect during the period involved in this litigation, provided as follows: "(a) Straight time rate shall be paid for any work performed from 8 A. M. to 12 Noon

and from 1 P. M. to 5 P. M., Monday to Friday inclusive, and from 8 A. M. to 12 Noon Saturday. (b) All other time, including meal hours and the Legal Holidays specified herein, shall be considered overtime and shall be paid for at the overtime rate."

For general cargo, the straight time hourly rate was $1.25 and the overtime hourly rate was $1.875.

It is the plaintiffs' contention that the excess of the "overtime" rate over the "straight time" rate represented a shift differential; that $1.875 per hour constituted the regular rate for the night shift; that when more than 40 hours of work was done in any one week and all such work was performed during the night shift, the overtime rate must be calculated at 150% of $1.875 and such rate applied to the hours in excess of 40; that in all cases the compensation should be calculated in one of two ways, the first of which plaintiffs prefer. 1. Total wages paid divided by total hours worked equals regular rate to be applied to 40 hours; and 150% thereof to the hours in excess of 40. 2. Wages payable at contract rates for the first 40 hours of work, divided by 40, equals the regular rate; 150% thereof is the rate to be applied to the hours in excess of 40.

There is a certain plausibility about plaintiffs' case. For instance, in the case of an employee who worked only during the so-called "overtime" hours, it is true that he received compensation at no greater rate for the hours in excess of 40 than for the hours within 40. Such a result seems to fly in the face of the statute.

The defendants' contention is on its face equally plausible. They declare that the "regular rate", which is the statute's measuring rod, has been contractually established by the parties at $1.25 an hour; that for all hours in excess of 40, defendants have, in accordance with the stattory command, paid $1.875 an hour; and that in addition, beyond the command of the statute, they have paid $1.875 an hour for all hours outside of a specified clock-pattern. Having paid more than required by statute, they contend, they have not violated its provisions.

The I.L.A. is not a party to the litigation. However, Mr. Joseph B. Ryan, its president, testified as a witness for the defendants. He reported that 30,000 members were employed at the Port of New York during the war; that the Union objectives were "to decasualize longshore work as much as possible, to have the work done in the daytime as much as possible, and make it as expensive for the employers as possible on Sunday"; that there has been no strike of longshoremen from 1907 to 1945; and that the Union was opposed to the suit "as it might wipe out all of the gains we had made for our men over a period of 25 years".

This controversy requires for its resolution a delicate adjustment to accommodate the harmonious application of three national policies. A heavy handed meshing of these three policies with the industrial machine which fails to minimize the friction at their points of contact can generate enough heat to impair one or more of the policies or severely injure the machine itself.

In chronological order we have (1) the National Labor Relations Act, July 5, 1935, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., to encourage the practice of collective bargaining; (2) the Fair Labor Standards Act, June 25, 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., to correct and eliminate the labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well being of workers; (3) the national need during the war for the maximum of production as illustrated by Executive Order 9301, February 9, 1943, 8 Fed. Reg.1825, establishing the 48 hour week for the duration of the war.

A few simple illustrations make this necessity clear.

1. A number of industries have, by collective bargaining, established a workweek of less than 40 hours—36 or 30—although actual work is pursued during 48 hours or longer. In such industries the employees receive "straight time" compensation for the stipulated hours and "time and a half" for all hours in excess thereof. Manifestly they do not receive, for hours in excess of 40, 150% of the average rate paid for the hours within 40. I see nothing in the policy and purposes of F.L.S.A. which forecloses bona fide negotiation between employers and a union for a shorter work week than 40 hours a week.[1]

2. A number of industries have developed collectively bargained agreements which have established a work week measured not only by a specified number of hours per week but by a specified number of hours per day—usually, eight hours. Compensation for hours of work in excess of the prescribed daily schedule of eight hours is calculated at 150% of the established rate even if the aggregate of hours for the week does not exceed 40. Assuming a work schedule of five 10-hour days, the employees would receive under their contract, compensation at overtime rates for 8 hours of the first forty. The rate of pay for hours in excess of forty would be less than 150% of the average rate for the hours within forty. Manifestly, the application to such an employment arrangement of either of the formulae suggested by plaintiffs would constitute a deterrent to the negotiation of such employment contracts.

3. Following the promulgation of Executive Order No. 9301, and in many instances before that date, in response to the war-time demand for production, the 48 hour work week became quite general. In the case of newly recruited employees in the war industries, 48 hours measured the "normal" work week throughout the term of their employment. In a sense, the 40 hour week was merely a theoretical fiction as opposed to the "real" fact of a 48 hour week. The logical extension of plaintiffs' argument would require a holding that in paying such employees for the 8 hours of overtime at a rate equal to 150% of the straight time rate, such employers had violated the F.L.S.A.; that the wages payable to such employees must

---

[1] Presumably a labor contract which established a one-hour week with provision for compensation for "time and a half" for all hours in excess of one hour would fail, as a device to circumvent F. L.S.A.

now be recalculated by finding the "regular rate" to consist of the quotient of total weekly wages, divided by 48, and the overtime rate as equal to 150% thereof. Would employers, even in the exigencies of the war, have so readily yielded to the demands of national policy for a longer work week if they could foresee such an enlarged wage liability?

Whatever the answer to such a rhetorical question, it is clear that the application of either of plaintiffs' formulae to the Nation's wage bill retrospectively would create havoc with established labor relations, put collective bargaining in the category of a device for obtaining money under false pretenses and probably strain the resources of a substantial proportion of American industry.

Such catastrophic results are inevitable once we accept plaintiffs' underlying premise—that in determining the "regular rate" intended by Congress, we must close our eyes to the contract in good faith negotiated between employer and employees and look only to the actual work pattern. Upon such a premise, genuine collective bargaining cannot live.

If we are free to reject the contractual "regular rate" in the case of longshoremen, there is no rational basis for not rejecting it in the three illustrations. The inevitable consequence of such a rule would be severely to restrict the scope of collective bargaining, to check the development of agreements more favorable to employees than the minimum standards established by F.L.S.A. and to retard the use of overtime even when national interest required it.

Such a dilemma is not a necessary implication of the F.L.S.A. That Act can more easily be read to be in harmony with the N.L.R.A. and a flexible work pattern. The F.L.S.A. does not speak of an average rate; it speaks of a regular rate. Congress has not circumscribed the courts in the selection of a "regular" rate.

The Supreme Court has already given the cue. Collective bargaining agreements, though favored by the law, will not be permitted to do open violence to the policies of the Fair Labor Standards Act.

Walling v. Harnischfeger Corp., 1945, 325 U.S. 427, 65 S.Ct. 1246, 1250, 89 L. Ed. 1711. The converse is likewise true. F.L.S.A. should not lightly override the policy of collective bargaining. F.L.S.A. establishes minimum standards. Collective bargaining has freedom to move unhampered above the floor F.L.S.A. establishes.

In Walling v. Belo Corp., 1942, 316 U.S. 624, 631, 62 S.Ct. 1223, 1227, 86 L.Ed. 1716, the court said, "In its initial stage the question to which this dispute gives rise is a question of law, a question of interpretation of the statutory term 'regular rate'. But it is agreed that as a matter of law employer and employee may establish the 'regular rate' by contract".

The dissenting justices did not challenge this proposition. They said, page 636 of 316 U.S., 62 S.Ct. 1229, 86 L.Ed. 1716, "The Court's interpretation that, in the absence of bad faith, any form of contract which assures the payment of the minimum wage and the required overtime complies with the Act may be assumed to be correct". They differed only in their construction of the contract as providing for weekly wages with variable hours.

Analysis of the instant contract reveals a rather unique situation. We are not here concerned with a condition like that confronting the Supreme Court in Walling v. Helmerich & Payne, Inc., 1944, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29. There a scheme was devised by a mathematical arrangement, unrelated to the facts, to defeat the purposes of F.L.S.A. Here we are dealing with a collectively bargained agreement which is the natural development of a long history. Nor is the problem of this case that which the Supreme Court dealt with in Walling v. Harnischfeger Corp., supra, where regular incentive bonuses were unlawfully excluded from the regular rate of compensation.

In both of these cases, and arguably in the Belo case, there was a normal work week, and a regular rate of compensation which was capriciously or at least designedly distorted in order to exhibit a mechanical compliance with F.L.S.A. The identifying mark of the case at bar is the absence of any norm, any regularity. Both

parties have emphasized the casual, irregular character of the employment. Once you cut loose from the anchor of the agreement, neither employee nor employer would have any means of calculating what rate of compensation has been earned until sometime after the event. Employees working side by side would be earning different rates of compensation. An employee's compensation would vary depending upon whether he worked for one employer or for more than one, in the course of a single week. While none of these considerations is of paramount significance, it cannot be said by a court that they are beyond proper evaluation by a labor union seeking to maintain orderly and peaceful labor relations in a highly casual field of employment. Decasualization, concentration of work during daylight hours, uniformity of compensation and simplicity of calculation are legitimate objectives of a collective labor agreement. None of them is artificially designed to defy the spirit of the F.L.S.A. while embracing its letter. The agreement here under scrutiny was not an artificial rearrangement of pre-F.L.S.A. rates of compensation in order to avoid additional compensation payable under that Act. It is not an attempt "to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes"; Walling v. Helmerich & Payne, Inc., supra [323 U.S. 37, 65 S.Ct. 14]; Walling v. Youngerman-Reynolds Hardwood Co., 1945, 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705. On the contrary it is the product of long history, collective bargaining, and an honest effort, however imperfectly achieved, to deal with the necessities of a unique situation.

Plaintiffs argue that the command of the statute is not satisfied unless at a chronological point, 40 hours after the commencement of work, a rate of 150% of the rate of compensation during the first 40 hours goes into effect. The statute clearly does not speak of premium payments for hours following the first forty, but only for hours in excess of forty. The only support for plaintiff's contention is the language of the court in Walling v. Youngerman-Reynolds Hardwood Co., supra, 325 U.S. 419, 423, 65 S.Ct. 1242, 1244, 89 L.Ed. 1705, "Thus by increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, Section 7(a) achieves its dual purpose * * *".

Clearly the court's attention was not addressed to the subtlety which plaintiffs now suggest. Until the Appellate Courts command otherwise I shall not assume that an employment contract which puts the premium rate into effect for all hours in excess of 36, violates the statutory mandate, although no change in rate is effected at the end of 40 hours.

A contract cannot arbitrarily convert a shift differential into an overtime premium. But neither should the circumstance that war time exigencies vastly multiplied the occasions for overtime work convert true overtime premiums into shift differentials.[2]

Confessedly the line of distinction between the two may at times be difficult to discern. One of the economists identified the ratio of the premium as the only reliable guide. Shift differentials are usually represented by very modest premiums—5¢—15¢ per hour.[3] The economics of the shift differential are that the more intensive use of plant and equipment permits the employer to pay a somewhat higher wage without incurring costs higher than in one shift operation and perhaps even to obtain

[2] Of the 20 plaintiffs, only 4 did all their work during contract "overtime" hours; two worked only a very small number of "straight time" hours; four worked more "straight time" hours than "overtime" hours.

[3] Economic Stabilization Director issued a policy directive, dated March 8, 1945, which placed a definite limitation on the amount of shift differentials which the National War Labor Board might approve or direct for non-continuous shift operations. Under this limitation, the differentials could not exceed four cents for the second shift and eight cents for the third shift. This was supplemented by a directive of April 24, 1945, which permitted the N.W.L.B. to approve or direct shift differentials for continuous shift operations in amounts not to exceed four cents for the second shift and six cents for the third shift. (C.C.H. Labor Law Service, Vol. 1 A, parags. 10,-034.11 and 10,462.)

lower costs. The shift differential is not designed to deter plural shift operation. The 50% overtime premium, as provided by statute and by the labor agreement here, is expressly designed to deter the penalized activity.

On the evidence adduced here it cannot be doubted that the "overtime" premiums established by I.L.A. agreement were designed to curtail, and measurably succeeded in curtailing, excessive and abnormal hours. Even during the peak of the Battle of the Atlantic there was a far greater concentration of work during the regular 44 hour period than during "overtime" hours. The fact that throughout the war stevedores were required to obtain special permission from the War Shipping Administration before they could put longshoremen to work after 5 P.M. throws light upon the deterrent purpose and effect of the penalty payment.

In the instant case, the collectively bargained agreement established a regular rate. True in a few instances the employee never received the regular rate because all of his work fell into the "overtime" period. That is a fortuitous circumstance which does not detract from the regularity of the rate.

I conclude that defendants have not violated the F.L.S.A. except in the following instances:

1. Where a defendant failed to pay a plaintiff who was employed as a header, gangwayman or assistant foreman, receiving therefor additional compensation at the regular rates of 5¢, 5¢ and 15¢ per hour, respectively, one and one-half times such regular rates for hours in excess of 40 during any work week.

2. Where a defendant failed to pay a plaintiff who was employed as a longshoreman handling the specific types of cargo enumerated in paragraphs 4(b)-(e), inclusive, of the collective agreement, one and one half times the "straight time hourly rates" set forth in the collective agreement for such types of work for hours worked in excess of 40 during any work week.

3. Where defendant Bay Ridge Operating Co., Inc., failed to pay plaintiffs Alston, Roper and Tolbert at a rate of one and one-half times the "straight time hourly rate" at which said plaintiffs were employed, for hours worked in excess of 40 during any work week, all during "straight time" hours.

With respect to these specific items additional proof will be received and supplemental findings made.