AARON et al. v. BAY RIDGE OPERAT-
ING CO. et al.

BLUE v. HURON STEVEDORING
CORPORATION.

Nos. 272, 273, Dockets 20619, 20620.

Circuit Court of Appeals, Second Circuit.

June 3, 1947.

Rehearing Denied June 24, 1947.

**666**

Max R. Simon and Goldwater & Flynn, of New York City (Monroe Goldwater, Max R. Simon, James L. Goldwater, and Joseph E. O'Grady, all of New York City, of counsel), for plaintiffs-appellants.

John F. X. McGohey, John F. Sonnett, and J. Francis Hayden, all of New York City, and Marvin C. Taylor, Mary L. Schleifer, and Peyton Ford, all of Washington, D. C., for defendants-appellees.

Before SWAN, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Section 7(a) of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., provides: "No employer shall * * * employ any of his employees * * * for a workweek longer than forty hours * * * unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The fundamental question before us here turns on the interpretation of "regular rates." Since ours is but an intermediate court, of course, in construing those words we are bound by the pertinent decisions of the Supreme Court.

These appeals are from judgments to the extent that they are adverse to plaintiffs, longshoremen working in the Port of New York, who maintain that defendants violated the Act by not paying plaintiffs one and one-half times the "regular rate" for hours, in certain workweeks, in which plaintiffs worked for defendants in excess of forty hours. It is urged by the defendants that the "regular rate" is controlled by provisions of collective bargaining agreements between the defendants and the union, International Longshoremen's Association, to which plaintiffs belonged in the years in question. The annual collective agreements made with this union since 1921 have provided for a "basic working day" of eight hours and a "basic working week" of forty-four hours. Beginning in 1918, these agreements fixed two sets of hourly rates: (1) Specified hourly rates were set for "work performed from 8 A.M. to 12 Noon and from 1 P.M. to 5 P.M., Monday to Friday inclusive, and from 8 A.M. to 12 Noon Saturday." (2) With a few exceptions, one and one-half times these rates were fixed for what the agreements called "all other time." In the Fall of 1938, after the enactment of the Fair Labor Standards Act, the agreement changed the labels for these respective periods: The first was now called "straight time"; the second was now called "overtime," the rates for that period being newly described as "overtime rates." This nomenclature was thereafter used in the agreements and is contained in the agreements for the years involved in these suits. No other significant changes

were made in the agreements after the Act went into effect.[1]

During the years 1943-1945, here involved, in most instances the defendants applied the terms of these agreements in paying the plaintiffs. As a result, if one of the plaintiffs in a given week worked, say, fifty hours during the so-called "overtime" period, he received for the excess ten hours precisely the same rate per hour as he was paid for the forty hours; that is, he received merely the contract rate—called the "overtime rate" in the contract—for all the fifty hours. If, in a given workweek, he worked thirty hours during the so-called "straight time" period and twenty hours in the so-called "overtime" period, again he received merely the contract rates; that is,

---

[1] One change is noted in the trial court's Findings 33 and 43a, which appear in the Appendix to this opinion.

The agreement contained the following "wages scale":

"4. Wage Scale: The wage scale shall be as follows:

| General Cargo Agreement | Straight Time | Overtime |
|---|---|---|
| (a) General Cargo of every description including barrel oil when part of General Cargo, and all General Cargo handled in refrigerator space with the temperature above freezing | $1.25 | $1.87½ |
| (b) Bulk Cargo, ballast, and all coal cargoes, including loading and trimming coal for a ship's own bunker purposes | 1.30 | 1.92½ |
| (c) Cement in bags | 1.30 | 1.92½ |
| (d) Wet hides, creosoted poles, creosoted ties, creosoted shingles and soda ash in bags | 1.40 | 2.02½ |
| (e) Refrigerator space cargo—meats, fowls and other similar cargo—which is to be transported with the temperature in the refrigerator at freezing or lower; these rates shall be paid the full gang | 1.45 | 2.07½ |
| (f) Kerosene, gasoline and naphtha in cases and barrels, when loaded by case oil gangs, and with a fly | 1.45 | 2.17½ |
| (g) Explosives | 2.50 | 3.75 |

(i) When handled down the Bay, the time shall start from the time when men leave the pier until the time they return to pier.

(ii) When handled down the Bay, men shall supply their own meals, but $1.00 per meal shall be allowed by the employer.

(iii) When explosives, such as are customarily handled down the Bay are handled at any pier, men shall be paid at the Explosive rate of pay.

(iv) Any dispute as to what explosives are, shall be settled by the Bureau of Explosives whose decision shall be final and shall be accepted by both sides.

| | | |
|---|---|---|
| (h) Damaged Cargo | 2.50 | 3.75 |

(i) All cargo damaged by either fire or water, when such damage causes unusual distress or obnoxious conditions, and, also, in all cases where men are called upon to handle cargo in the ship under distress conditions.

(ii) The damaged cargo rates shall not be paid when sound cargo in a separate compartment is handled."

for the excess ten hours, he received merely the contractually-labelled "overtime rate."[2]

■■ The trial judge held this method of payment correct, on the ground that the rates fixed in the agreements for the "straight time" period constituted the "regular rate" referred to in § 7(a) of the Act.[3] In so deciding, he relied on Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. We think he erred. As recently as May of this year, the Supreme Court, in a unanimous opinion by Chief Justice Vinson—confirming what had been said previously by this court and by several other inferior courts[4]—decided that the Belo case doctrine must be limited to agreements which contain a "provision for a guaranteed weekly wage with a stipulation of an hourly rate," and that other types of agreement, whether or not the result of collective bargaining, cannot, by their terms, determine what is the "regular rate" named in the Act. That "regular rate," said the Court, is an "actual fact." See 149 Madison Avenue Company v. Asselta, 67 S.Ct. 1178, 1184, citing Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705. See also Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29.

In the instant case, the "actual fact" concerning the "regular rate" appears in the findings of the trial judge which are supported by the evidence and which we understand the defendants do not dispute. In an Appendix to this opinion, we have set forth pertinent portions of those findings.

Because government counsel, appearing for the defendants,[5] have earnestly asserted the grave precedential importance of these appeals, and because of our respect for the able trial judge, we have considered his opinion with unusual care. None of us, however, is able to agree with that opinion. We conclude that the judgments, in so far as they are adverse to the plaintiffs, must be reversed.

Faced with substantially similar collective bargaining agreements and with facts in many respects the same, the Seventh Circuit in 1944 reached a conclusion like ours, as to longshoremen in the Great Lakes area; see Cabunac v. National Terminals Corp., 139 F.2d 853, affirming the able opinion of Judge Duffy, sub nom. International Longshoremen's Association v. National Terminals Corp., D.C., 50 F.Supp. 26. Judge Cooper, a few months ago, also reached this conclusion as to longshoremen working in Puerto Rico, in a case in which, as here, government counsel represented the employer and apparently advanced the very arguments advanced here. See Ferren v. Waterman S. S. Corp., D.C., 70 F. Supp. 1.

We cannot agree with the argument that our conclusion is unsound because it may require separate computations for each week at rates which may vary from week to week. In Overnight Motor Transport Co. v. Missel, 316 U.S. 572, 580, 62 S.Ct. 1216, 1221, 86 L.Ed. 1682, the Court said that compensation capable of reduction to an hourly basis by application of a uniform principle is "regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week though week by week the regular rate varies with the number of hours worked." We take this statement as meaning that the statutory element of regularity is met where a single principle or

---

[2] These are suppositious examples, but they illustrate, in simple form, what actually occurred.

[3] As a consequence, one of his Conclusions of Law reads: "The 'straight time hourly' rate set forth in each * * * collective Agreement * * * constituted the regular rate at which plaintiffs were employed * * *"

Defendants incorrectly stated in their brief that the foregoing was a finding of fact.

[4] Walling v. Uhlmann Grain Co., 7 Cir., 151 F.2d 381, 383; Walling v. Alaska Pacific Consol. Min. Co., 9 Cir., 152 F.2d 812, 815; Asselta v. 149 Madison Ave. Corp., 2 Cir., 156 F.2d 139; Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, 784 note 4.

[5] In oral argument we were told that government counsel were the sole counsel for defendants here because the United States will ultimately pay any judgment against defendants, due to wartime "cost-plus" contracts between the United States and the defendants.

rule is uniformly applied in order to obtain the rate.[6]

We think that the administrative interpretations suggest no conclusion different from ours.[7] The one conceivable exception has to do with Sunday and holiday work. In a letter of May 14, 1943, discussing the Cleveland Stevedore Co., the Administrator said that "overtime compensation for Sunday or holiday work * * * may be credited toward overtime due under the Act," because "it can be regarded as time outside the employee's normal working hours"; but we must also consider the following: (1) The day after that letter of May 14, 1943 was written, Judge Duffy held the contrary; see International Longshoremen's Association v. National Terminal Corp., D.C., 50 F.Supp. 26, affirmed in Cabunac v. National Terminals Corp., 7 Cir., 139 F.2d 853. (2) In an opinion published in the Wage & Hour Manual, 1944-1945 Cum.Ed. page 227, the Assistant Solicitor referred to a previous ruling, in the Administrator's Interpretative Bulletin No. 4, that an employer might consider "as overtime compensation" extra amounts of compensation paid "for hours worked outside the normal or regular working hours"; the opinion said that such extra compensation might be considered overtime compensation only if the "hours compensated for" were "hours not normally worked by the employees" giving as an example "work on Sundays, holidays, or at a time of day when the employee does not normally work"; the opinion, however, went on to explain that "hours worked on Sundays and holidays are generally outside the 'normal or regular working hours.'" In the instant cases, on the facts disclosed in the findings,[8] the hours worked on Saturday afternoons, Sundays and holidays were surely not "outside the normal or regular working hours."

It is suggested that, if the contractual "straight time" rate is not the "regular rate," then that rate for any employee in any week must be ascertained by averaging the rates paid for the first forty hours of work in that week. But in Walling v. Halliburton Oil Well Cementing Co., 67 S.Ct. 1056, 1059, the Court stated that "in Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, we held that the regular rate was to be determined by dividing the wages actually paid by the hours actually worked." See also Ferren v. Waterman S. S. Co., supra; cf. Walling v. Wm. Schollhorn Co., 54 F.Supp. 1022.

The Administrator's Press Release 1913 stated that theretofore, where an employee received more than one rate during a workweek, the Administrator had ruled that the employer must pay the employee an "overtime rate of one and one-half his average hourly earnings for the entire week, computed by dividing the weekly earnings at both rates by the total number of hours worked in the week," but that thereafter an employer would have an option, in the alternative, to compute the overtime rate at one and one-half times the rate at which the employee worked

---

[6] The trial judge, speaking of the difficulty of ascertaining the amounts due if "once you cut loose from the anchor of the agreement," said, "an employee's compensation would vary depending upon whether he worked for one employer or more than one, in the course of a single week"; D.C. 69 F.Supp. 956 at page 960. But see, on this very point, Walling v. Twyeffort, Inc., 2 Cir., 158 F.2d 944, 947, as to employment during the same week of a single employee by several different employers.

[7] Indeed, they support plaintiffs' contentions. Thus paragraph 69 of Interpretative Bulletin No. 4 says that "in determining whether he has met the overtime requirements of section 7 the employer may properly consider as overtime compensation paid by him for the purpose of satisfying these requirements, only the extra amount of compensation —over and above straight time—paid by him as *compensation for overtime work —that is, for hours worked outside the normal or regular working hours—* regardless of whether he is required to pay such compensation by a union or other agreement." (The italics are as in the original.)

Perhaps because of the government's financial interest in these cases, the Administrator on these appeals did not follow his frequent practice of filing (with our permission) a brief amicus, discussing his interpretations.

[8] See the Appendix to this opinion, especially Findings 19, 20, 34, 35 and 46. See also, D.C., 69 F.Supp. at page 960, note 2.

during the hours in excess of forty. However, this Release was later qualified by Press Release 1913A, which stated, "In order to take advantage of this [revised] rule, the records of the employer must show which method of computing overtime compensation he had determined to follow." Nothing in the evidence here indicates that either defendant so kept its records.

■ Counsel for plaintiffs are allowed $2,000.00 for their services on these appeals.[9]

Reversed and remanded for determination of the amounts due plaintiffs in accordance with this opinion.

### Appendix

### Findings of Fact

"No. 14: "In the longshore industry in the Port of New York there are no regular or usual hours of work. Employment is highly casual in character, more so than employment in any other major industry. This condition is primarily the product of the uncertainties of maritime, shipping and weather conditions, the unpredictable character of ship and overland cargo arrivals and the use of the 'shape' as a hiring device, as defined in Finding No. 16. The casual character of the work is reflected both in the difficulty of finding employment, the irregularity of the hours of beginning and stopping work, and in the uncertainty of the duration of employment during any specified period. In these respects the work pattern of longshoremen is unique.

"No. 15: During the period in suit, and for many years prior thereto, longshoring in the Port of New York has had the following characteristics. With rare exceptions, longshoremen do not work regularly or continuously for any one stevedoring company, but shift from employer to employer and from pier to pier as casual workers, working when they want, and when and where work is available. There is no regular weekly or even daily, employment. Longshoremen may work for more than one employer in a single day, or during the same week. The total number of hours worked in any day or week varies widely. Irregularity of both daily and weekly hours is characteristic of the industry.

"No. 16: Employment of longshoremen is wholly dependent upon the selection of men at one or another of the 'shapes' at the head of each pier where work is to be done. At three stated hours during the day, namely at 7.55 a. m., 12.55 p. m. and 6.55 p. m., men seeking employment gather in a group or semicircle, constituting the 'shape,' at the head of a pier where work is available. The foreman stevedore then selects from the 'shape' such men as he desires to hire, to work until 'knocked off,' that is, told to quit. The selection of a man from the shape carries with it no obligation on the part of the employer concerning any specified length of employment, except for work requirements of the Collective Agreement relating to minimum hours under specified conditions. The duration of employment depends entirely upon the determination of the stevedore or the steamship company. Where longshoremen work during 'straight time' hours, it is customary for the employer to defer until about 4.30 p. m. his decision as to whether the men shall do work after 5 p. m. If it seems likely that night work will be required, the employer may definitely engage the men, or he may order them to shape at 6.55 p. m. If the men are directed to shape at 6.55 p. m., and the employer then decides not to work that night, because of weather conditions or other circumstances relating to the arrival or handling of cargo, he is at liberty not to hire any man at the 6.55 p. m. shape, and thereby he incurs no obligation for compensation. At times the men have been directed to shape up at hours other than the three specified shape hours hereinabove mentioned.

"No. 17: When men have been selected individually at the shape, they are organized into gangs of about 20 men, in charge of a foreman, and put to work loading or unloading a ship. Where a gang has been accustomed to work as a group, it is assigned to a particular hatch or job. A gang may hold together for a few hours, or it

---

9 Of course, the district court will, in addition, make allowances for the services in that court.

may operate as a unit as long as there is work in a hatch or ship, which may be for less than a day or for more than a week. They may, and sometimes do, work as a group on frequent occasions for one employer, being employed regularly or steadily. The men are employed only when there is work to be done. At the end of a working period a gang may be told to 'knock off,' in which event the men would shape again at a later shaping hour, or on the next day, if they so desired, if work was available at the pier.

"No. 18: During the period in suit, the defendants in some instances adopted the practice of posting notices on bulletin boards of the arrival of ships, or of calling gangs, working customarily together, by a prior notice posted at the pier or by telephonic communication from the stevedoring foreman to the gang leader or hatch boss, and from him, in turn, to the individual men. This practice, however, did not bring about a departure from the established custom that the men shape up at the customary times, regardless of whether they had been working at that pier on the previous day or even earlier the same day.

"No. 19: The amount of work which may be available for longshoremen in the Port of New York, and the time of the day or the day of the week when such work may be available, depend principally upon the number of ships in port and the length of their stay, and varies from day to day, week to week and season to season.

"No. 20: Under the terms of the Collective Agreement in effect during the period in suit, and under previous Collective Agreements in effect over a period of many years, the longshoremen in the Port of New York have been obligated to work any night of the week or on Sundays, Holidays or Saturday afternoons, when directed, with special limitations on Saturday nights.

"No. 22: The stevedoring business in the Port of New York prior to World War II, had the following characteristics: About seven or eight stevedoring companies worked for one steamship company each, whereas about 60 other stevedoring companies, known as contracting stevedores, worked for a number of steamship lines. Before a

ship docked in this port, the stevedores knew the vessel's definite or approximate date of departure and also the type of cargo to be discharged or loaded. Thereupon, they made a determination concerning the best way of handling the cargo at the lowest possible cost. Tentative plans for the handling of the cargo were readjusted from time to time on account of delayed arrival, necessity for repairs, delay in arrival of outgoing freight, weather conditions and other factors.

"Stevedoring companies never worked any more 'overtime' than was necessary, because it was more economical for the steamship company, and more profitable to the stevedores, to work during 'straight time' hours. It was the common practice for stevedoring companies to use auxiliary equipment, and to work the largest number of day gangs within the vessels' limitations of space and equipment. Permission to work 'overtime' had to be obtained by the stevedoring company from steamship company. The decision whether to work 'overtime' was controlled by the necessity of meeting scheduled sailing dates in the case of passenger liners, and otherwise by financial considerations turning on whether the over-all cost of a later departure exceeded the cost of 'overtime.' The contract between stevedoring companies and steamship lines usually provided that the former would be paid on a tonnage basis, plus the actual cost of 'overtime,' including 'overtime' differentials, insurance and Social Security taxes. For the most part, the longshoremen preferred to work during the daytime rather than during the night. The amount of 'overtime' that the men worked depended to a considerable extent upon the stevedoring companies by whom they were employed."

"No. 25: The steamship companies in the Port of New York have preferred to confine the handling of cargo to 'straight time' hours to the greatest possible extent. They give permission to work 'overtime' when such work is unavoidable. The 50 percent over-riding charge for work done during 'overtime' hours is a deterrent because of the added cost and the intensity of the competition between American ships and ships of foreign registry.

"No. 26: Stevedoring companies try to avoid working 'overtime' hours. Their contracts are entered into on a commodity tonnage basis. When permission is granted to work 'overtime,' stevedores receive in addition to the commodity tonnage rate only the actual additional amounts paid out in wages, plus insurance and Social Security tax. 'Overtime' work is less efficient than work in 'straight time' hours. These factors contribute to the reduction of the stevedore's profits, if his employees are worked 'overtime.'"

"No. 30: Night work, Sunday work, work on Saturday afternoons and on certain legal holidays, have been compensated at rates higher than the prevailing day rates in the longshore industry in the Port of New York at least as far back as 1887."

"No. 33: In the Fall of 1938, after the enactment of the Fair Labor Standards Act, the Collective Agreement for the longshoremen's industry in the Port of New York introduced, with reference to work at night, Saturday afternoons, Sundays and Holidays, on general cargo, the terms 'overtime' and 'overtime which shall be paid for at the overtime rate.' The parties, nevertheless, from the passage of the Fair Labor Standards Act through the period in suit, made no actual change in the general manner of compensating longshoremen as compared with that prevailing previously, except under the circumstances noted in Finding No. 43(a)."

"No. 34: During most of the period in suit the defendants required some longshore work practically around the clock, day in and day out, except Saturday nights. Defendant Huron employed some groups exclusively on night work. Defendant Bay Ridge assigned its gangs either to day or night work as shipping exigencies required, and its gangs frequently commingled day work with night work on different days in the same working week.

"No. 35: No stevedoring company worked exclusively from 8 a. m. to 5 p. m. and Saturday mornings. Even prior to World War II some stevedoring companies had fairly regular recourse to some night work.

"No. 36: During the period in suit defendants endeavored to have longshoremen available for work in regular gangs which were called out by defendants to shape up as shipping exigencies required. Some of the plaintiffs normally sought employment at other piers only when they could not get work at the piers served by the defendants sued herein. Even when ordered out by defendants, however, the gangs were required to shape up in the customary manner and no man had assurance of employment or guarantee of its duration, except for the provisions of the Collective Agreements for minimum hours of pay under specified conditions of employment."

"No. 41: An examination of the employment record of each of the plaintiffs shows that their work followed no regular pattern. There were many weeks during which they were not employed by the defendants. They worked varying numbers of days in different weeks. The number of hours worked on the days when they did work varied greatly. Many weeks they worked less than 40 hours; other weeks more than 40 hours. They handled a variety of cargoes, and some of them worked at various times as headers, gangwaymen or assistant foremen.

"No. 42: During the period in suit the defendants paid plaintiffs the 'straight time hourly rate' for work performed during the contract 'straight time' hours and the 'overtime hourly rate' for work performed during the contract 'overtime' hours, plus the customary differentials for work performed as headers, gangwaymen and assistant foremen. These rates were paid by the defendants regardless of whether plaintiffs worked more or less than 40 hours a week, with the single exception stated in Finding No. 43(a).

"No. 43(a). If, and only if, a longshoreman worked more than 40 hours between 8 a. m. and 12 noon, and 1 p. m. and 5 p. m. on Mondays to Fridays, inclusive, and between 8 a. m. and 12 noon on Saturday of that workweek, none of these days being a holiday, he was paid an additional sum for work on Saturday morning in excess of 40 hours namely 62½ cents per hour, plus, when applicable, the differentials mentioned in Finding No. 11; however, he was not

paid an additional 50 per cent of the differentials.*

"(b) A longshoreman who worked on general cargo in excess of 40 hours a week, all of his working hours being 'overtime' hours, was paid the 'overtime' hourly rate of $1.87½ an hour, for all hours both within and beyond 40.

"(c) A longshoreman who worked on general cargo 40 hours or more during 'overtime' hours, and also worked on Saturday from 8 a. m. to 12 noon during the same workweek, received $1.87½, the 'overtime hourly rate,' for the 'overtime' hours, and $1.25, the 'straight time hourly rate,' for the Saturday hours.

"(d) A longshoreman who worked on general cargo for eight hours on Monday, from 8 a. m. to 5 p. m., and ten 'overtime' hours during each of the following four days and also on Saturdays from 8 a. m. to noon, received compensation at the 'straight time' rate for Monday and Saturday, and the 'overtime' rate for the other hours.

"(e) A longshoreman who worked on general cargo for 40 hours or less during the week, all of these hours being within the 'overtime' classification, was paid the 'overtime hourly rate' of $1.87½ per hour.

"No. 44: During the period in suit, the plaintiffs, if they so desired, worked Sundays and Holidays whenever work was available to them, just as any other day.

"No. 45: The 'basic working day' and the 'basic working week' referred to in the Collective Agreement were not the working day or working week normally, regularly or usually worked by plaintiffs during the period in suit.

"No. 46: During the period in suit, it was not unusual for the plaintiffs, in their employment by defendants, to start their work on a ship at night rather than by day, and it was not unusual to start their work on Saturday afternoon or Sunday."

On Petition for Rehearing.

PER CURIAM.

The petition for rehearing is denied. Our decision remanding the suits should be interpreted to permit the district court to consider any matters presented to it under the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq. We do not, however, determine the scope or validity of any portions of that Act, since those matters have not been argued on these appeals.

---

* Finding 11 reads: "In addition to the wage scale provided for in the Collective Agreement, longshoremen, including the plaintiffs, whenever assigned by stevedores, including the defendants, to perform a specified part of the work calling for additional responsibility, were paid, by custom, additional compensation, called heading differentials, as follows: 5 cents per hour for work as a 'header.' (A header is a longshoreman who is in charge of a group of men, usually four, working in the hold of the ship); 5 cents per hour for work as a 'gangwayman.' (A gangwayman is a longshoreman who is in charge of a group of men, usually four, working on deck); and 15 cents per hour for working as an assistant foreman. These rates of additional payment were not increased when the employee worked in excess of 40 hours or during 'overtime' hours."