JEFFERSON SCHOOL OF SOCIAL SCIENCE, Petitioner,

v.

SUBVERSIVE ACTIVITIES CONTROL BOARD, Respondent.

No. 12876.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 9, 1962.

Decided Dec. 17, 1963.

5. 117 U.S.App.D.C. ——, 331 F.2d 64 (1963).

Mr. Harry Sacher, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for petitioner.

Mr. Kevin T. Maroney, Atty., Dept. of Justice, with whom Mr. Frank R. Hunter, Jr., Gen. Counsel, Subversive Activities Control Board, Mr. George B. Searls, Mrs. Lee B. Anderson, and Mr. Robert L. Keuch, Attys., Dept. of Justice, and Messrs. Charles F. Dirlam and Peter P. Hanagan, Attys., Subversive Activities Control Board, were on the brief, for respondent.

Mr. Benjamin F. Pollack, Atty., Dept. of Justice, also entered an appearance for respondent.

Mr. Edward J. Ennis, New York City, filed a brief on behalf of American Civil Liberties Union, as amicus curiae.

Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and DANAHER, Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

This is another of the cases referred to in Labor Youth League v. Subversive Activities Control Board,[1] decided April 25, 1963. The Jefferson School of Social Science, an unincorporated association, was founded in 1944. According to the Board it was formed in New York City by the Communist Party of the United States through the merger of two Communist Party schools—the School for Democracy and the New York Workers School,—primarily to serve as a training school for the Party. Most of the students who attended the school were members or potential recruits in the Party and while in attendance were trained in the programs, strategy and tactics of the Party through the teaching of Marxism-Leninism.

The Attorney General, on April 20, 1953, petitioned the Board for an order requiring the school to register as a Communist-front organization under Section 7 of the Subversive Activities Control Act of 1950.[2] After hearings, the Board issued its order and accompanying report on June 30, 1955. After a timely petition for review had been filed in this court, and on November 22, 1961, the school filed a motion to dismiss the appeal and to vacate the Board's order for mootness, alleging that it (the school) was no longer in existence. Pursuant to a remand order, the Board held hearings concerning the existence of the school. A "Report on Remand" was issued and is now before the court.

We first consider the motion to dismiss. Upon such a motion, based upon alleged mootness on account of the alleged dissolution of an organization-party, the burden of proof is of course upon the movant. We agree with the Board that in the case at bar the Jefferson School failed in this burden.

The hearing upon remand was long. The attorney for the school, the trustee upon liquidation, who had been director of faculty and curriculum, a trustee of the school who was on the faculty, two additional members of the faculty, the real estate agent who handled such matters for the school, and the accountant who prepared its tax returns all testified. It was established that on November 26, 1956, eight persons, said by a witness to be all of the trustees of the school at that time, signed a resolution and agreement of dissolution. The document was definite and final in its terms. Each signer agreed with the others "that said school and the conduct and operation thereof by THE JEFFERSON SCHOOL OF SOCIAL SCIENCE shall cease, terminate and come to an end on the 2nd day of January, 1957." One of the trustees was designated trustee in liquidation and authorized to "sell and dispose of all the property, effects, contracts and rights", to collect and pay the debts, and "to settle all the affairs" of the school. This trustee prepared a list of the fur-

---

1. 116 U.S.App.D.C. 151, 322 F.2d 364.

2. 64 Stat. 993, as amended, 50 U.S.C. § 786.

niture and equipment, which was quite extensive, consisting principally of classroom chairs, tables, and office and restaurant equipment. He advertised in city newspapers and sold the property to various and sundry purchasers. A federal income tax return for the year September 1, 1956, to August 31, 1957, was prepared by an accountant and filed. It showed a sale of fully depreciated equipment and an item of "Moving & Liquidation Expense $3,371.41", and on the attached balance sheets no assets were shown. The return was subjected to an examination by the Intelligence Unit of the Internal Revenue Service and was accepted as filed.

The school had occupied as a tenant an entire building of six or seven stories at the northwest corner of 6th Avenue and 16th Street, owned by a corporation, 575 Sixth Avenue Realty, Inc. This building was sold on December 13, 1956, and the school ceased to occupy it.

All the foregoing was clearly established. The failure of proof of dissolution lies in the uncertainty which encompasses several features of the situation.

In the first place, although of relatively minor importance, the board of trustees of the school "normally" consisted of thirteen members, but only eight trustees signed the dissolution agreement. These eight, as we have pointed out, were said to be all of the trustees at the time. But the absence or non-existence of the other five, "normally" members, was not explained. The constitution and bylaws of the school contained no provisions as to dissolution and simply provided that all members of the association should be trustees.

In the second place, although also of relatively minor importance, there is considerable uncertainty about the relationship between the school and its landlord, 575 Sixth Avenue Realty, Inc. The attorney for the school was the secretary of the realty corporation. One of the trustees of the school (Trachtenberg) was treasurer of the realty company.

There were five stockholders in the corporation, of whom Sacher, Trachtenberg, and a Fred. W. Field were three, but the other two were not identified. The rent charged the school by the realty corporation corresponded pretty much with the fixed charges on the building. There were financial transactions other than the rent between the two organizations, the most notable being the payment of $27,150 by the realty corporation to the school just before the dissolution, said to be reimbursement for improvements charged to expense over the years. The realty corporation is still in existence and owns a building in New York. The extent, if any, to which this corporation represented the physical and financial elements of the school is not clear. The corporation played a part in the matter of the library and the matter of the presently-existing School for Marxist Studies, which we shall discuss in a moment. At any rate it seems to us that complete proof of the dissolution of the Jefferson School required some factual explanation of its relationship with the realty corporation and a negation of the obvious possibility that the continued existence of the corporation is indeed a preservation, in the same hands, of the financial and property elements which were parts of the school.

The two most important features of the lack of proof of the dissolution involve (1) a library and (2) a presently-existing school.

In the building occupied by the school was a large and valuable library, some 30,000 titles and 10,000 or 15,000 pamphlets. The school catalog contained the listing: "LIBRARY: More than 30,-000 volumes available for use by students and public." The liquidating trustee while on the witness stand was asked, "Mr. Wilkerson, did the school have a library?", and he answered, "Yes." His testimony continued:

"Q Did you sell the books of your library?

"A No.

"Q What did you do with those?

"A    They were moved to storage over on 15th Street.

\*    \*    \*    \*    \*    \*

"Q    You moved all those books?

"A    That's right.

"Q    Where are they now, to the best of your knowledge?

"A    I don't know. Whether they are still where they went, I have no knowledge.

"Q    Do you know if there is anyone who could tell us as to the location of those books at the present time?

"A    No, I don't. My connection with the books—I don't remember whose decision it was. I am sure it must have been the board of trustees at some point in dissolving—but I know that my instructions were, as trustee, to deliver the books to a place on East 15th Street, the address of which I don't remember exactly. Whether they are still there, I just don't know.

"Q    You say instructions. From whom did you receive those instructions?

"A    I presume—well, honestly, I don't remember. I remember that I was to move the books to 15th Street. I think that this must have come from discussions in the board of trustees. I don't remember the details on it.

"Q    But you never sold those books?

"A    No.

"Q    So far as you know, those books are still somewhere?

"A    So far as I know.

"Q    Do you know whether they are being used by anybody now?

"A    I don't know.

"Q    What sort of place did you store them in? Was it a store?

"A    No.

"Q    What was it?

"A    It was a loft.

"Q    Did you pile them on shelves or just pile them on the floor there, do you remember?

"A    We moved them in. What happened to them after that, I don't know. We had a commercial mover take them over there.

"Q    Why didn't you sell them? Weren't they a part of the assets?

"A    That is what I was trying to recall. Frankly, I just don't remember when or where, but my assumption is that the board must have decided not to dispose of those books but to put them there for possible use. I don't know what. There is not very much of a market for that kind of thing anyway, as you may know.

\*    \*    \*    \*    \*    \*

"Q    They couldn't be readily obtained, could they, in any regular book store?

"A    I would assume that that is true. It was a valuable collection of books.

"Q    For use of a school of that type?

"A    Yes."

It was established that the books were in fact moved to part of a loft in a building at 34 East 15th Street subleased to 575 Sixth Avenue Realty, Inc., the corporation we have mentioned hereinabove. The sublease was signed on behalf of the realty · corporation by its treasurer, Trachtenberg, who was, as we have seen, also a trustee of the Jefferson School. The books are still in that loft, and the realty corporation pays the monthly rent.

The other principal circumstance which casts uncertainty upon the dissolution of the Jefferson School is the existence of the New York School for Marxist Studies. A few months after the execution of the document of dissolution on November 26, 1956, one of the members of the faculty of the school (Herbert Aptheker), who was also one of the signatory trustees, began a series of lectures on Marxism,

which was one of the courses he had been teaching.[3] He then opened a school, known as the Faculty of Social Science, of which he was the director. It was not a success. He then, in the fall of 1960, opened another school, the New York School for Marxist Studies, which is presently existing and operating. Aptheker is the director and is on the faculty.

The new school has from 200 to 300 students each term. It operates at a slight deficit, which is made up by contributions from the students. It permanently rents an office and rents classrooms on a per diem basis.

As its name indicates, the new school is for the study of Marxism, which was the purpose of the Jefferson School. The last catalog of the Jefferson School stated, "The School teaches the principles of scientific socialism, Marxism, analyzing both world socialist developments and the distinctive problems of advancing the cause of socialism in our own land." That catalog and the current catalogs of the School for Marxist Studies show the offerings of strikingly similar courses. Eight of the instructors at the new school taught at the Jefferson School. The 575 Sixth Avenue corporation made financial payments to Aptheker and to the Faculty of Social Science. When the latter closed, its bank balance was transferred to the new School for Marxist Studies. The Jefferson Book Shop, formerly in the quarters of the Jefferson School, although not a part of that school, is now in the quarters of the School for Marxist Studies. The catalog of the latter school says that the school "maintains" the book shop.

We think the circumstances we have related—(1) the non-participation in the dissolution agreement of five of the thirteen "normally" trustees of the school, (2) the relationship of the school to 575 Sixth Avenue Realty, Inc., which is presently existing and operating, (3) the continued existence of the library, unsold, (4) the continued operation of the book shop, and (5) the existence and operation of the School for Marxist Studies, a sizable institution teaching the same courses for the same purposes as did the Jefferson School, and manned in large part by former instructors at the latter school—throw considerable doubt upon the reality of the alleged dissolution.

We caution that what we have said concerning the School for Marxist Studies is not a conclusion, or the equivalent of a conclusion, that this school is indeed the Jefferson School operating on a lesser scale. The only conclusion we suggest on this record is that the circumstances we have related raise a doubt as to whether the Jefferson School was actually and in fact dissolved. The movant of the motion to dismiss failed to sustain its burden of proof. Whether the order of the Board would apply to any or all of the entities (other than the Jefferson School itself) discussed in this opinion, is not now before us; such determinations would await other proceedings in tribunals other than the Board.

The difficulties attendant upon a consideration of the dissolution, or an alleged dissolution, of an unincorporated association were discussed by us in the *Labor Youth League* case, supra. We need not repeat that discussion here.

An order will be entered denying the motion to dismiss.

We turn now to the merits of the petition to review. In its brief petitioner states eight points, the last of which is that the findings on which the Board relied are not supported by a preponderance of the evidence. The argument on the point was brief, and the substance of it was a legal contention that the programs of the School could not be held to be integrated so deeply with the program of the Communist Party as to support the constitutional application of the statute to the School. The brief did not contain any contention to the effect that the basic findings of fact lacked support in the evidence on the record, such as the conten-

---

3. He also testified, "I was asked by people to lecture, I think, on American history. I am not certain now."

tions made in others of this group of cases. At the oral argument counsel for the School argued the motion to dismiss and then argued two of his legal questions. Then he said:

"I do not discuss the evidence. I believe that—and here I do not want to appear to be presumptuous —but I think we have gone far enough in our country in suppressing certain freedoms, and I think it's about time either for this court or for the Supreme Court, since it has promised so often that not so long as this Court sits will certain things take place, for the Court for once to say we are now fulfilling that promise and we are saying to you and to those who would suppress freedoms in the United States, this is the time to say this Court has now sat long enough and will not suffer these incursions on individual liberty."

This statement was a clear indication that counsel for the School desired a decision by the court upon the constitutional questions presented and did not want the possibility of such a decision hampered by consideration of the evidentiary point. We pass therefore to the consideration of the legal points presented by the School. As we have indicated, there were principally two such questions. One concerns the constitutionality of the registration provisions of the statute,[4] and the other concerns the appli-

cability to this case of the decision of the Supreme Court in the *Communist Party* case.[5]

■ In the *Communist Party* case the Supreme Court passed upon the constitutionality of the registration provisions of the statute, sustaining them as valid. Relying upon that authority we now reject the contentions of the petitioner in that regard.

■ The second contention now presented to us concerns the applicability to this petitioner in this proceeding of the decision of the Supreme Court that the Communist Party of the United States is a Communist-action organization within the meaning of the statute. We need not here enter upon an extended discussion of the nature of the doctrine of *res judicata*. It is a rule of judicial administration the purpose of which "is to secure the peace and repose of society by the settlement of matters capable of judicial determination." [6] As described at length by the Supreme Court in the *County of Sac* case,[7] the doctrine has two rules of application: A judgment upon the merits constitutes an absolute bar to a subsequent action upon the same claim between the same parties or those in privity with them; and, if a second action between the same parties (or those in privity with them) is upon a different claim, the prior judgment operates as an estoppel as to those matters in issue upon the determination of which the prior finding was rendered.[8] In any event the doc-

4. *Supra* note 2.

5. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

6. Southern Pacific Railroad v. United States, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). See also Reed v. Allen, 286 U.S. 191, 198, 52 S.Ct. 532, 76 L.Ed. 1054 (1932); Fayerweather v. Ritch, 195 U.S. 276, 299, 25 S.Ct. 58, 49 L.Ed. 193 (1904); 2 Freeman, Judgments § 626 at 1319 (5th ed. 1925); Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 Iowa L.Rev. 217, 219-20

(1954); Moschzisker, Res Judicata, 38 Yale L.J. 299 (1929); Note, 29 Ill.L. Rev. 93 (1934).

7. Cromwell v. County of Sac, 94 U.S. 351, 352-53, 24 L.Ed. 195 (1876).

8. Partmar Corp. v. Paramount Corp., 347 U.S. 89, 91, 74 S.Ct. 414, 98 L.Ed. 532 (1954); Tait v. Western Md. Ry. Co., 289 U.S. 620, 623, 53 S.Ct. 706, 77 L.Ed. 1405 (1933); Deposit Bank v. Frankfort, 191 U.S. 499, 513-514, 24 S.Ct. 154, 48 L.Ed. 276 (1903); Southern Pacific Railroad v. United States, 168 U.S. 1, 48-49, 18 S.Ct. 18, 42 L.Ed. 355 (1897).

trine applies not only to the actual parties to the first litigation but also to those persons in privity with them. The term "privity" is an elusive concept, without any precise definition of general applicability. It is not necessary, however, for us to explore all its subtleties here. It is sufficient that the word designates a person so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved.[9] For example, a subsidiary corporation is held to be in privity with its parent in respect to the common corporate business. In the case at bar it has been found as a fact by the Board that the School is substantially dominated, directed and controlled by the Communist Party and that it operates primarily to achieve objectives of the Party. Those findings establish an identity of interest between the School and the Party in respect to the nature of the Party as an auxiliary of the Communist movement. Privity having thus been established, the finding of the Supreme Court in respect to the Party estopped the School from re-litigating the identical issue determined in the prior case.

The order of the Board is

Affirmed.

BAZELON, Chief Judge (dissenting).

The issue of mootness is a variant of the "case-or-controversy" requirement.[1] It requires consideration of the nature of the conflicting interests involved and how they would be affected by exercising or declining jurisdiction.

In determining a claim of voluntary dissolution by an organization against which the Subversive Activities Control Act is directed, the strong public interest in the Act's enforcement must be weighed against the serious sanctions which the Act attaches to mere membership in such an organization.[2] In Labor Youth League v. Subversive Acitivities Control Board, 116 U.S.App.D.C. 151, 322 F.2d 364 (1963), we thought these sanctions made inapplicable the rule, sometimes followed in other fields, that a defendant's voluntary acts cannot moot a proceeding.[3] Upon a showing that substantial steps had been taken to dissolve the organization, we remanded the case to the Subversive Activities Control Board "with instructions to place it in an indefinitely inactive status."[4] We thought that proper accommodation of the conflicting interests did not require determination of the issue of mootness, but only preservation of the record until the Board's fears of renewed activities should

9. Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148 (1917); Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co., 48 F.2d 213 (S.D.N.Y.1930), aff'd per curiam, 48 F.2d 215 (2d Cir. 1931); Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 66 F.2d 81 (6th Cir. 1933); Momand v. Universal Film Exchanges, 172 F.2d 37, 44-45 (1st Cir. 1948), cert. denied, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949). See Van Brode Milling Co. v. Kellogg Co., 113 F.Supp. 845, 847 (D.Del.1953).

1. California v. San Pablo & Tulare R.R., 149 U.S. 308, 13 S.Ct. 876, 37 L.Ed. 747 (1893); Poe v. Ullman, 367 U.S. 497, 503-04, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Cf. Bickel, Foreword: The Passive Virtues, 75 Harv.L.Rev. 40 (1961).

2. "Meaningless in many ways though the formal listing of a non-existent organization on the register would be, the people who had in years past been members—without, let us remember, realization of the Communist nature of what was once an entity—would be enveloped in a cloud, faced with the possibility of drastic events if some Government official, or some unneighborly neighbor, or some uncordial fellow employee should choose to accuse them of holding illegally a Government or defense-plant job." Labor Youth League v. Subversive Activities Control Board, 116 U.S.App.D.C. 151, 159-60, 322 F.2d 364, 372-73 (1963).

3. See, e. g., Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944).

4. 116 U.S.App.D.C. at 161, 322 F.2d at 374.

materialize. We have recognized this status of "quasi-mootness" in several other cases.[5] I think we should recognize it here.

I think the Jefferson School took substantial steps to dissolve. The record shows execution of a dissolution agreement, appointment of a trustee in liquidation, termination of the school's lease, and disposal of its assets. Although the Board challenges the good faith of the dissolution on several grounds, all but one are minor.[6] The Government's case portrays the Jefferson School as continuing in the form first of the Faculty of Social Science and now the New York School for Marxist Studies.[7] The question is whether the Jefferson School, after its claimed dissolution, has continued operation under other names.

The Faculty of Social Science began to operate in the fall of 1958—approximately a year and a half after the Jefferson School ceased operation—and ran until the spring of 1960. The New York School for Marxist Studies has been operating since the fall of 1960. Of the 28 people who have taught at the latter school, 8 taught at the Jefferson School, and 6 of these also taught at the Faculty of Social Science.[8] The Board found that many of the courses at the Jefferson School and at the Marxist School "have been in substance the same."[9] The Jefferson Bookshop, formerly at the Jefferson School, is now in the building of the Marxist School, but there is no evidence regarding its status or location between the closing of the Jefferson School and the opening of the Marxist School.

Though the Board relied on the similarity of the two schools, it refrained from finding that the Marxist School is in fact a continuation of the Jefferson School:

"There is a strong suggestion from the evidence of a purpose common to all three schools—indoctrination through Communist Party member-instructors of 'Marxism as the theory and practice of scientific socialism.' The New York School for Marxist Studies *has many of the indicia* of the Jefferson School of Social Science.

\* \* \* \* \* \*

"Under all the circumstances the Board concludes that permanent dissolution of The Jefferson School has not been established by the preponderance of the evidence; a framework has been maintained and activity has continued from time to time which *has many of the indicia* of the

---

5. Blau v. Subversive Activities Control Board, 116 U.S.App.D.C. 184, 322 F.2d 397 (1963); Washington Pension Union v. Subversive Activities Control Board, 116 U.S.App.D.C. 185, 322 F.2d 398 (1963); Haufrecht v. Subversive Activities Control Board, 116 U.S.App.D.C. 190, 322 F.2d 403 (1963). But see California Labor School v. Subversive Activities Control Board, 116 U.S.App.D.C. 180, 322 F.2d 393 (1963); Patterson v. Subversive Activities Control Board, 116 U.S. App.D.C. 182, 322 F.2d 395 (1963), where the evidence showed a cessation of activities but no substantial steps to dissolve the organization.

6. Although there were "normally" thirteen trustees, there were only eight signatures to the dissolution agreement. The realty company which leased the building to the Jefferson School and had some directors in common with the school still exists. The School's library still exists, but is in storage and apparently not used. It is

agreed to be a unique collection of Marxist literature and is obviously being kept together for future use by someone, but this does not show that the school which once had it still exists. These facts show at most a significant likelihood of a reactivation, which does not justify departure from *Labor Youth League*. Blau v. Subversive Activities Control Board, supra.

7. Supplemental Memorandum of Attorney General on Motion to Dismiss the Petition for Review and Vacate Board's Order for Mootness, pp. 6–7.

8. When the Board held its hearings in 1954, the Jefferson School's faculty numbered approximately 50 and its enrollment about 1200; the Marxist School's enrollment is about 200. Thus the Marxist School is at most only a rump of the Jefferson School.

9. Report of the Board on Remand at 7 (June 20, 1962).

previous activity of the organization." [10]

This court supports the Board's view that the issue of mootness may be resolved against the Jefferson School without finding whether the Marxist School is a continuation of the Jefferson School. But the Jefferson School exists as the Marxist School or not at all. To affirm the Board's order is to say the Jefferson School does exist as the Marxist School. I do not see how we can make this finding when the Board could not.

This case will have substantial impact on the Act's definition of "organization," [11] and hence on the ultimate effectiveness of the Act. The Subversive Activities Control Board says:

"These questions are properly viewed in the light of the fact that this unincorporated activity is a Communist-front organization. Being this latter type the technical organizational form otherwise assumed by the group from time to time is not of paramount importance and formal organizing and dissolving processes are not necessarily controlling." [12]

If the Board's broad view is adopted, any organization or group of people which resembles a group earlier found to be a Communist-front or Communist-action organization may be required to register without the procedural safeguards of the Act.[13] On the other hand, if "organization" were construed narrowly and totally new hearings were required after periodic changes of name, this would make the Act practically meaningless. I think we avoided both pitfalls in *Labor Youth League* and should follow that case here.

I do not reach any other questions.

---

10. Report of the Board on Remand at 10, emphasis supplied.

11. "The term 'organization' * * * includes a group of persons, whether or not incorporated, permanently or temporarily associated together for joint action on any subject or subjects." Subversive Activities Control Act § 3(2), 50 U.S.C. § 782 (2).

12. Report of the Board on Remand at 4–5.

13. This danger is especially serious where the activity involved is a school. Teaching is entitled to a high degree of protection.