Walter GRIBBEN, et al., Plaintiffs,

v.

**LUCKY STAR RANCH
CORP., Defendant.**

No. 84–0316–CV–W–1.

United States District Court,
W.D. Missouri, W.D.

Dec. 5, 1985.

Arthur J. Kase, Rubins Kase Rubins & Cambiano, Kansas City, Mo., for plaintiffs.

John R. Cleary, Linde Thomson Fairchild Langworth Kohn & Van Dye, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, Senior District Judge.

### I.

This case pends on defendant's motion for summary judgment based primarily on res judicata and statute of frauds grounds. It is appropriate that we outline the procedural steps followed by the parties before we make our findings of fact and state the conclusions of law in support of our ultimate conclusion that defendant's motion for summary judgment should be granted.

The files and records in this case reflect that counsel for the respective parties commendably recognized that almost all of the complicated factual circumstances could be agreed upon by stipulation of the parties. Accordingly, the parties entered into their first stipulation on December 14, 1984. Thereafter, on April 26, 1985 a further stipulation was agreed upon which incorporated the December 14, 1984 stipulation as a part of the April 26, 1985 joint stipulation.

Defendant filed a motion for summary judgment on May 25, 1985. Extensive briefs in support and opposition were thereafter filed by the parties. On September 16, 1985, however, defendant's pending motion for summary judgment was fully discussed at a pretrial conference held that day. In an order entered on September 16, 1985 this Court determined that genuine issues of material fact existed on the question of whether plaintiff Gribben and International Genetics, the named defendant in the New York judgment, were in privity. We accordingly denied the motion at that

time and set the case for jury trial to commence on October 14, 1985.

The parties, however, filed a joint application to remove the case from the jury trial docket. On October 1, 1985 we granted that application under procedures that anticipated that any and all disputed issues of fact would be presented at a non-jury hearing to commence on October 21, 1985. Our October 1, 1985 order required the parties to file proposed findings of fact and proposed conclusions of law together with their respective lists of witnesses to be called at the hearing, a list of depositions to be admitted in evidence, and an index of all documentary evidence that would be offered as exhibits.

The transcript of the proceedings held on October 21, 1985, the date on which the hearing was scheduled to be held, established that neither side wished to adduce any testimony by live witnesses. The parties agreed that the deposition testimony of the witnesses identified by the parties should be considered as the trial testimony of the particular witness whose deposition testimony was identified. Further proceedings were directed on October 21, 1985 which required the parties to file a cross-fire to opposing counsel's proposed findings of fact and proposed conclusions of law on or before November 11, 1985. The purpose of the cross-fire was to obtain further agreement in regard to both questions of fact and questions of law. The parties complied with those directions in an exemplary manner.

Plaintiffs' cross-fire response to defendant's proposed findings of fact admitted substantially all of the findings of fact proposed by the defendant. Indeed, a substantial number of the findings of fact are based on the two stipulations agreed to by the parties.

Because we find and conclude that defendant's proposed findings of fact set forth the relevant and material circumstances of this case, we adopt all findings of fact that defendant proposed that have been admitted to be true by plaintiffs' cross-fire response. The very small number of findings proposed by the defendant which the plaintiffs denied will be identified by underlining such portions of defendant's proposed findings that plaintiffs denied in their cross-fire response. We will, however, append a footnote to all portions of the defendant's proposed findings which plaintiffs have denied to indicate the reason why we will adopt the findings denied by plaintiffs' cross-fire response as part of our findings of fact in this case.

Plaintiffs have also admitted a substantial number of defendant's proposed conclusions of law. We will state all of the conclusions of law which plaintiffs have admitted to be true in subpart A of part III, *infra,* and will therefore state in subpart B of part II, *infra,* a number of additional conclusions of law which we believe must be applied to the findings of fact made in part II to follow.

We now make the findings of fact in accordance with what we have stated above. It will be understood, of course, that all findings of fact which are not underlined were admitted to be true by plaintiffs' cross-fire response. The portions of the findings that are underlined are made by the Court for the reasons stated in the footnotes appended to those portions of the underlined findings.

## II.

### Findings of Fact

1. On July 25, 1983, the defendant Lucky Star Ranch Corp. purchased from a company named VM Farming Corporation 233 head of simmental cattle. The cattle that are at issue in this lawsuit were included in these 233 head. Defendant's Exhibit A is an authentic copy of the bill of sale for this purchase of these 233 head of cattle. (Paragraph 1, Joint Stipulation; defendant's Exhibit A.)

2. At the time the defendant Lucky Star Ranch Corp. purchased the 233 head of cattle from VM Farming Corporation, it was agreed between it and VM Farming Corporation that the latter would care for the cattle at a farm in Rhinebeck, New

York known as the VM Farming farm. James Reardon was employed by VM Farming Corporation as farm manager of the farm. (Paragraph 18, Joint Stipulation.)

3. From the time the defendant purchased the cattle from VM Farming Corporation until on or about January 4, 1984, the cattle were, except for four head, located at the VM Farming farm in Rhinebeck, New York. (Paragraph 33, Stipulation.) The four head were located on the VM Farming farm until December, 1983. (Paragraph 34, Stipulation.)

4. In 1981 or 1982, Henry Holt talked with the plaintiff, Walter Gribben, about Gribben financing a real estate time share development located in New Zealand with which Holt was involved. Gribben, after having a number of discussions with Holt, did not provide the financing. (Walter Gribben deposition, pages 15 and 16.)

5. In early 1983, Henry Holt advised the plaintiff, Walter Gribben, that Holt was involved in selling cattle embryo contracts to third-party investors who were being induced to purchase these contracts because of the tax benefits associated with them. Holt told Gribben that these investors were financing their purchases through a Holt controlled business entity. Holt told Gribben that he had a substantial amount of these receivables which he wanted to discuss. Gribben agreed to finance the receivables by loaning Holt $500,000.00 against approximately $1,250,000.00 of the embryo receivables. (Walter Gribben deposition, pages 14 and 15.)

6. In the latter half of 1983, Holt repaid the $500,000.00 loaned by Gribben. At the time Holt repaid the money, he informed Gribben that he anticipated a massive sales program in 1983 and felt he was going to have some problems with respect to acquiring recipient cattle. Holt informed Gribben that he had been successful in working out with one or two individual investors a program under which they would buy the cattle and then lease them back to him. Gribben asked Holt to call him if Holt found that he needed additional investor help and if he was willing to arrange it on a bulk transaction base. (Walter Gribben deposition, pages 17, 18, and 19.)

7. In October of 1983, Henry Holt, the president of International Genetics, Inc., and the plaintiff, Walter Gribben, entered into discussions concerning Gribben purchasing cattle and then leasing the cattle purchased back to International Genetics for its use in its embryo transplant program. (Paragraph 2, Joint Stipulation.) On November 9, 1983, Gribben wrote a memorandum in which he outlined the terms of the cattle transaction he was considering with Holt. Defendant's Exhibit B is an authentic copy of the memorandum. (Paragraph 3, Joint Stipulation.) The terms outlined in the memorandum are, among others, the following: (a) Holt was to sell Gribben 300 cows owned by Holt for a price of $100.00 each; (b) Gribben was to purchase 1,500 cows from Holt, or a third party, at a cost not to exceed $750.00 per cow; (c) Gribben would lease all the cows purchased to Holt for an amount equal to 40% of the original purchase price, payable per month on a 29-month lease; and (d) *Gribben would have an unconditional right to purchase the entire herd at the conclusion of the lease.*[1] (Defendant's Exhibit B.)

8. Since the cattle purchased by Gribben were to be *leased back*[2] to Internation-

---

1. Plaintiffs denied that International Genetics, rather than Gribben would have the unconditional right to purchase the entire herd. Exhibit B attached to the Joint Stipulation, written by Gribben, expressly states that "I will have an unconditional right to purchase the entire herd at the conclusion of the lease...." We find the underlined portion of the above finding to be true.

2. Plaintiffs denied the use of the term "leased back". Paragraph 6 of the Joint Stipulation expressly states that "it was understood by Henry Holt and by the plaintiff Walter Gribben that International Genetics, Inc. was to locate the cattle for the plaintiffs to purchase and *lease back* to International Genetics, Inc." We find the underlined portion of the above finding to be true.

al Genetics, it was understood between Holt and Gribben that International Genetics was to locate cattle which were suitable to be purchased and then leased back to it. (Paragraph 6, Joint Stipulation.) It was understood that Holt would negotiate the purchase price for the cattle. (Lynda St. James' deposition, page 21.)

9. Plaintiff, Walter Gribben, and International Genetics entered into an agreement entitled "Bovine Lease Agreement" which is dated December 15, 1983. Defendant's Exhibit C is an authentic copy of this Agreement. (Paragraph 4, Joint Stipulation; defendant's Exhibit C.) This Agreement provides for Gribben to purchase the cattle identified in Schedule A of the Agreement. (Paragraph 1, defendant's Exhibit C.) The cattle at issue in the instant action are included in the 227 head of cattle described in this Schedule A. (Paragraph 5, Joint Stipulation.) The Agreement also provides that the cattle purchased by Gribben are to be leased back by Gribben to International Genetics for a 29–month period. (Paragraphs 2 and 3, defendant's Exhibit C.) The Agreement provides that, during the term of the lease, Gribben was to pay, with certain described limitations, the costs of feed and veterinary fees for the cattle. (Paragraph 5, defendant's Exhibit C.) The Agreement also provides that International Genetics is to defend, indemnify and hold Gribben harmless from and against any claim or cause of action relating to the ownership, sale or removal of the cattle or by reason, or as a result, of any act or omissions by International Genetics for itself or as agent or attorney-in-fact for Gribben. (Paragraph 13, defendant's Exhibit C.) Additionally, the Agreement provides that International Genetics is to keep the cattle free and clear of any and all liens, charges, encumbrances or adverse claims. (Paragraph 14, defendant's Exhibit C.) Under the Agreement, International Genetics could elect to purchase the cattle. The Agreement provides that International Genetics intends to sell cattle embryos to investors and provides

that the embryos are to be implanted in the cows that are the subject of this Agreement. Investors whose creditworthiness was approved by Gribben were, according to the Agreement, to execute promissory notes for the balance of the embryo purchase price not paid by them in cash. (Paragraph 23.1, defendant's Exhibit C.) Under the Agreement, International Genetics pledged and granted a security interest to Gribben in these investor promissory notes. (Paragraph 23.2, defendant's Exhibit C.)

10. Curt Rodgers was, at all times relevant to this action, the owner and operator of North American Auction Company in Platte City, Missouri and of Rodger's Land & Cattle Co. in Huntsville, Missouri. Rodgers was involved in International Genetics' embryo transplant program in that he maintained the donor and recipient cows involved in the transplanting. (Paragraph 13, Joint Stipulation.)

11. Curt Rodgers and Henry Holt first looked at the cattle at issue in this action in late October of 1983. (Paragraph 13, Joint Stipulation.) Rodgers first contacted the plaintiff, Walter Gribben, on November 11 or 12 of 1983 about Gribben purchasing these cattle for *lease back* [3] to International Genetics. (Paragraph 14, Joint Stipulation.)

12. In December of 1983, James Reardon and Curt Rodgers moved four head of the cattle that are at issue in this action from the VM Farming farm to International Genetics' premises in Terrel, Texas. (Paragraph 34, Stipulation.) On or about January 4, 1984, the balance of the cattle at issue were moved from the VM Farming farm to the following locations: part to Dr. O'Leary's farm in Salt Point, New York; part to Jay Roebuck's farm at or near Salt Point, New York; and, the balance to Curt Rodgers' premises in Huntsville, Missouri, known as Rodger's Land & Cattle Co. (Paragraph 35, Stipulation.) At the time the cattle were moved to Dr. O'Leary's

---

**3.** Plaintiffs again complain about the use of the words "leased *back*". See footnote 2 above for the parties use of the words "leased back" in paragraph 6 of the Joint Stipulation.

farm and to Jay Roebuck's farm, both farms were leased to International Genetics. (Paragraph 15, Joint Stipulation.)

13. On or about January 26, 1984, Lucky Star Ranch Corp. instituted a lawsuit in the Supreme Court of the State of New York, County of Dutchess, against International Genetics. (Paragraph 7, Joint Stipulation.) International Genetics was served with process in this case on January 30, 1984. (Paragraph 7, Joint Stipulation.) In the complaint filed by Lucky Star in this action it alleged that in early January of 1984, International Genetics converted cattle owned by Lucky Star and it prayed for a judgment for possession of the cattle. (Paragraph 8, Joint Stipulation.) Defendant's Exhibit D is an authentic copy of the complaint filed in the New York action. (Paragraph 7, Joint Stipulation.) The cattle which were at issue in the New York action are the same cattle that are at issue in the instant action. (Paragraph 8, Joint Stipulation.) On February 17, 1984, the law firm of Sherman & Citron of New York City entered International Genetics' appearance in this New York action. (Exhibit B of the Affidavit of Raymond M. Maguire, defendant's Exhibit G.) By agreement between the attorneys of record for Lucky Star and for International Genetics the date for International Genetics to file a responsive pleading in the New York action was extended twice. The first extension was to March 5, 1984, and the second was to March 12, 1984. (Affidavit of Raymond M. Maguire, defendant's Exhibit G; Exhibits C, D, and E of defendant's Exhibit G.)

14. On January 28, 1984, Raymond Maguire, the attorney representing Lucky Star in the New York action, sent a letter to Curt Rodgers in which he enclosed a copy of the complaint filed in that action, a copy of an Affirmation by Maguire filed in that action and a copy of a show cause order entered in the action. (Paragraph 16, Joint Stipulation.) Defendant's Exhibit E is an authentic copy of the letter and its enclosures. (Paragraph 16, Joint Stipulation.) Rodgers received the letter and its enclosures on February 1, 1984. (Defendant's Exhibit E; Curt Rodgers' deposition, page 44.) By early February of 1984, the plaintiffs in the instant action knew of the New York action. (Paragraph 17, Joint Stipulation.)

15. On April 3, 1984, the court in the New York action entered a judgment against International Genetics and in favor of Lucky Star Ranch Corp. for possession of the cattle. (Paragraph 7, Joint Stipulation.) Defendant's Exhibit F is an authentic copy of the judgment entered. (Paragraph 7, Joint Stipulation.) [4]

16. No contract for sale of the cattle at issue in the instant action was made between the defendant Lucky Star Ranch Corp. and any of the plaintiffs. (Paragraph 9, Joint Stipulation.) No contract for the sale of the cattle at issue in the instant action was made between Lucky Star Ranch Corp. and Hollow Circle Holsteins. (Paragraph 10, Joint Stipulation.) No writings signed by International Genetics or Hollow Circle Holsteins exist which indicate that a contract for the sale of the cattle at issue was made between Interna-

---

**4.** Plaintiffs state in their cross-fire response that paragraph 15 above is "incomplete." Paragraph 7 of the Joint Stipulation stated the following: "On or about January 26, 1984, Lucky Star Ranch Corp. instituted a lawsuit in the Supreme Court of the State of New York, County of Dutchess, against International Genetics, Inc. and James Reardon. The document attached to this Stipulation as Exhibit D is a true and authentic copy of the Complaint filed by Lucky Star Ranch Corp. in that action. International Genetics, Inc. was served with process in that action on January 30, 1984, and on February 17,

1984, entered a general appearance. On April 3, 1984, the Supreme Court of the State of New York, County of Dutchess, entered a judgment. A true and authentic copy of the judgment entered is attached to this Stipulation at Exhibit E."

We have, of course, carefully considered all of the exhibits attached to the Joint Stipulation in ruling defendant's motion for summary judgment and find that paragraph 15 of our findings is an accurate statement of the stipulated facts and of the judgment entered in the New York court.

tional Genetics and Hollow Circle Holsteins. (Paragraph 11, Joint Stipulation.)

17. Defendant's Exhibit K is, except for the handwritten name "Henry Holt" which appears thereon, an authentic copy of a document prepared by Raymond Maguire and sent by him to Henry Holt, upon the latter's request, as the form of promissory note *which Lucky Star would require in the event a contract for the sale of the cattle was made between Lucky Star and International Genetics.*[5] (Paragraph 36, Stipulation, Raymond Maguire deposition, page 29.)

18. On or about December 29, 1983, the plaintiff, Walter Gribben, had an employee of International Genetics, a Ken McKay, deliver a cashier's check for $142,600.00 in New York to Jay Roebuck of Hollow Circle Holsteins for the purchase of 200 head of cattle. (Paragraph 21, Joint Stipulation.) Jay Roebuck was on Henry Holt's payroll. (Walter Gribben deposition, page 58.) *The 200 head of cattle for which this $142,-600.00 cashier's check was delivered did not include any of the cattle at issue in the instant action.*[6] (Paragraph 21, Joint Stipulation.)

19. On December 30, 1983, International Genetics issued a $50,000.00 check on its account at The First National Bank of Rhinebeck, payable to that bank for the purchase of a $50,000.00 cashier's check payable to Lucky Star. (Paragraph 21, Joint Stipulation.) This $50,000.00 cashier's check was delivered by International Genetics' employee, Ken McKay, on December 30, 1983 to Lucky Star's attorney, Raymond Maguire, in New York. (Paragraph 21, Joint Stipulation.) The proceeds of the cashier's check were deposited into a bank account of Lucky Star. (Paragraph 21, Joint Stipulation.) *Raymond Maguire did not understand that the $50,000.00 cashier's check was being tendered as a payment under any contract between Lucky Star and International Genetics nor did he accept it as such.* At the same time the $50,000.00 cashier's check was delivered to Maguire, Lucky Star's position was that *there was no contract with International Genetics which was in existence.*[7] (Raymond Maguire deposition, pages 24 through 28.)

20. On December 3, 1983, neither Jay Roebuck nor Hollow Circle Holsteins owned the cattle at issue in the instant action. (Jay Roebuck deposition, page 54.)

5. Plaintiffs deny only the clause that is underlined above. Paragraph 36 of the Stipulation of the parties expressly states that Exhibit K was "a true and authentic copy of a document which Raymond Maguire, upon Henry Holt's request that Maguire send him a form of a promissory note that Lucky Star would require *in the event a sale was made....*" (Emphasis added.) That exhibit shows on its face that the note was prepared for the signature of Holt as president of International Genetics and that Lucky Star Ranch Corp. was the payee of the $110,000.00 note. We find that Maguire's deposition testimony was consistent with the stipulation of the parties and that there was no evidence in the case to support a contrary finding.

6. Plaintiffs deny only the sentence underlined above. Paragraph 21 of the Joint Stipulation expressly states that: "On or about December 29, 1983, Gribben sent a cashier's check for $142,600.00 to Hollow Circle Holsteins directly for the purchase of 200 head of cattle" and that "[t]his 200 head of cattle did not include any of the cattle that are at issue in this action." We find the underlined portion of the above finding to be true.

7. Plaintiffs deny only the sentence and the clause of the following sentence underlined above. Plaintiffs' November 15, 1985 cross-fire reply to defendant's proposed findings of fact, however, expressly states that "[i]t is admitted that there was no written contract with International Genetics, but the jury is entitled to find from the evidence that an oral agreement existed." We disagree. We find the underlined portion of the above finding to be true.

Our determination that defendant's motion for summary judgment should be granted does not rule the question of whether the defendant may or may not be entitled to retain the proceeds of the $50,000.00 cashier's check. It must, however, be noted that even Maguire thought it was "very strange" when McKay delivered the $50,000.00 cashier's check that Lucky Star Ranch Corporation would be able to have both the $50,000.00 cashier's check and also still have its cattle. See pages 24 and 26 of Maguire's deposition. As will be apparent from the admitted findings in paragraphs 20, 21, and 22, *infra,* there were a number of other strange circumstances that produced the litigation of the New York case and this case.

21. The plaintiff, Walter Gribben, received a document entitled "BILL OF SALE" which bears the date of December 3, 1983, and purports to be signed by Jay Roebuck. (Paragraph 24, Joint Stipulation; defendant's Exhibit H.) After receiving this document, Gribben's attorneys wanted a bill of sale that was in a different form. (Walter Gribben deposition, page 28; Lynda St. James' deposition, page 31.) Henry Holt and the plaintiff, Walter Gribben, arranged for Ken McKay, an employee of International Genetics to go to New York in late December, 1983, to have Jay Roebuck sign a bill of sale in a different form. (Walter Gribben deposition, pages 29 and 30.) The first page of defendant's Exhibit I is the changed bill of sale form and was received by the plaintiff Gribben in the early part of 1984. (Walter Gribben deposition, page 31; Lynda St. James' deposition, page 31.) It bears the date of November 29, 1983, and purports to be signed by Jay Roebuck. (Defendant's Exhibit I.) This bill of sale was not signed by Jay Roebuck. (Paragraph 22, Stipulation; Walter Gribben deposition, page 31.) When Ken McKay went to New York to get the changed bill of sale form signed by Roebuck, he lost it in the airport. So, late at night in a bar, he asked Roebuck to sign two blank pieces of paper intending that the bill of sale form would then later be typed around the signature. (Lynda St. James' deposition, pages 68 and 69.)

22. The document identified as defendant's Exhibit J which bears the date of December 30, 1983, and which purports to be a bill of sale signed by Jay Roebuck, was not signed by him. (Paragraph 23, Stipulation.) The majority of the cattle described in this document were non-existent. (Lynda St. James' deposition, page 59.)

23. The plaintiffs' claim of ownership of the cattle at issue in this action is predicated on their claim that they purchased the cattle from Hollow Circle Holsteins. They claim that Hollow Circle Holsteins acquired ownership of the cattle by virtue of an assignment to it by International Genetics of the ownership rights to the cattle. The plaintiffs claim International Genetics acquired ownership of the cattle under a contract with Lucky Star Ranch Corp. (Paragraphs 13, 14, and 17, plaintiffs' "Complaint For Replevin", filed in the instant action on March 8, 1984.) [8]

### III.

#### Conclusions of Law

Plaintiffs' cross-fire admitted the conclusions of law which we state in subpart A of this part III. We have renumbered those admitted conclusions of law and have added defendant's paragraph number in parenthesis after the new consecutive number of the particular admitted paragraph.

In subpart B of this part III we shall state additional conclusions of law which plaintiffs do not admit but which we have concluded are applicable to the undisputed material factual circumstances of this case.

#### A.

1. The doctrine of res judicata operates as an absolute bar to the relitigation of the same cause of action between parties and their privies. *Jefferson School of Social Science v. Subversive Act Con. Bd.*, 331 F.2d 76 (D.C.Cir.1963). Its conclusive effect extends to all matters of fact and law that were, or could have been, determined in the initial action. *Cantor v. Multiple Listing Service of Dutchess County, Inc.*, 568 F.Supp. 424 (S.D.N.Y.1983). The doctrine of res judicata is applicable whether the judgment involved was rendered by the same or by a different court. *Forsyth v. Hammond*, 166 U.S. 506, 17 S.Ct. 665, 41 L.Ed. 1095 (1897).

---

**8.** Plaintiffs did not admit or deny paragraph 23 above. We find that paragraph 23 is an accurate summary of plaintiffs' original complaint for replevin filed March 8, 1984. We further find that plaintiffs' first amended complaint for replevin, filed June 5, 1984, and plaintiffs' second amended complaint, filed December 4, 1984, did not change the factual circumstances alleged by plaintiffs to support the pending action.

2. When a prior judgment is rendered in a state court, 28 U.S.C. § 1738 requires federal courts to give the judgment the same preclusive effect as the judgment would have received in the state in which it was rendered. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1083, 72 L.Ed.2d 262 (1982). Therefore, in the instant action, since it is a New York state judgment which the defendant contends acts as the bar to the instant action, it is New York law which controls for the purposes of determining whether or not the New York judgment has, under the doctrine of res judicata, a preclusive effect on the instant action.

3. The elements necessary for the imposition of the preclusive effects of res judicata are as follows: a prior judgment is rendered by a court of competent jurisdiction; the prior judgment is a final judgment on the merits; the same cause of action is involved in both actions; and, the same parties, or their privies, are involved in both actions. *Williams v. Codd*, 459 F.Supp. 804 (S.D.N.Y.1978); *In re Pugach*, 25 A.D.2d 642, 268 N.Y.S.2d 197 (1966).

4. The New York court which entered the judgment on April 3, 1984, in the *Lucky Star Ranch Corp. v. International Genetics* action was a court of competent jurisdiction. N.Y. Civil Practice Law and Rules § 301.

5. A judgment is final when the time for appeal has expired. The New York judgment was rendered on April 3, 1983. The time for appeal has clearly expired and, therefore, the New York judgment is a final judgment.

6. In order for a prior judgment to have a res judicata effect, it must have been one on the merits. *Kilduff v. Donna Oil Corp.*, 74 A.D.2d 562, 424 N.Y.S.2d 282 (1980). For res judicata purposes, a judgment is "on the merits" if the purpose of the action in which it was entered was to dispose of the claim on substantive rather than procedural grounds. *Saylor v. Lindsley*, 391 F.2d 965 (2d Cir.1968). Since a judgment by default substantively disposes of an entire claim, it is a judgment "on the

merits" for res judicata purposes. *Moyer v. Mathas*, 458 F.2d 431 (5th Cir.1972); *Willametz v. Munch*, 37 A.D.2d 695, 322 N.Y.S.2d 1016 (1971). Therefore, the judgment entered by the New York court on April 3, 1984, was on the merits.

7. It is well settled that a final judgment bars future actions between the same parties, or their privies. *Reilly v. Reid*, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978). Causes of action, for res judicata purposes, are the same if the two causes of action have such a measure of identity that a different judgment in the second action would destroy or impair rights or interests established by the judgment entered in the first action. *Schuylkill v. B & C Nieberg Realty Co.*, 250 N.Y. 304, 165 N.E. 456 (1929).

8. (9) The preclusive effect of res judicata may be applied not only to the parties to a prior action in which a judgment has been entered but, also to persons in privity with them. *Andrasko v. Calkins*, 47 Misc.2d 816, 263 N.Y.S.2d 256 (1965). Persons are in privity for res judicata purposes when the interests of the non-party are so closely related to the interests of the party, that the non-party can fairly be considered to have had his day in court. *In re Gottheiner*, 703 F.2d 1136 (9th Cir.1983).

9. (12) A privity relationship for res judicata purposes exists when the interests of a non-party are represented by a party in the former action. *Restatement (Second) of Judgments*, § 41 (1982), provides that a person who is not a party to an action, but who is represented by a party, is bound by a judgment rendered in the action as though he were a party. The non-party's representative may be constituted as such through some transaction antedating the litigation wherein the representative is given authority to manage and safeguard interest of the non-party. In such circumstances, the authority and responsibility to represent the non-party in the litigation is concomitant to the representatives' general managerial authority

and responsibility for the matter entrusted to him. The effect is to confer on the representative the requisite authority to participate as a party on behalf of the represented person. Such representation is equivalent to participation by the represented person himself.

■ 10. (15) Even if it could be said that the reasoning of *Gramatan, Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979), in an assignor-assignee relationship had application to a relationship such as that which existed between the plaintiffs and International Genetics, it must be recognized that the law provides, under special circumstances, for an assignee to be held to be in privity with the assignor even if the assignment predates the institution of the action against the assignor. *Wright, Miller & Cooper, Federal Practice and Procedure*, § 4462, at 554, 555. Under the uncontroverted facts of the instant case, such special circumstances exist. The plaintiff Gribben entered into the Bovine Lease Agreement with International Genetics. Therefore, as a matter of law, the plaintiffs were in privity with International Genetics in the New York action because they authorized International Genetics, in the Bovine Lease Agreement, to defend against any claims relating to the ownership of the cattle and to keep the cattle free and clear of any adverse claims. Therefore, by contract, the plaintiffs appointed International Genetics as their representative to defend the New York action. As such, the plaintiffs were clearly in privity with International Genetics in that action.[9]

### B.

11. The plaintiffs' claim is predicated on their contention that they are entitled to possession of the cattle at issue in this action. The cattle at issue in this action are the same cattle that were at issue in the New York action. The New York court in the judgment it entered determined that the defendant was entitled to possession of the cattle. Under the principles stated in *Schuylkill v. B & C Nieberg Realty Co., supra*, we conclude that the cause of action in this Court and the New York cause of action are the same for res judicata purposes. *Rankin v. Wyatt*, 335 Mo. 628, 73 S.W.2d 764 (1934), relied on by plaintiffs, does not support plaintiffs' argument to the contrary.

12. Plaintiffs' contention that only a lessor-lessee relationship existed between Gribben and International Genetics is untenable under the undisputed factual circumstances of this case. Rather, we conclude that under the findings of fact stated in part II above, the interests of the plaintiffs and International Genetics, so far as the cattle at issue are concerned, were so intertwined, so paralleled one another and were so inseparable that their interests were, at minimum, closely related and, therefore, the plaintiffs were in privity with International Genetics in connection with the New York action.

13. The representative relationship described in § 41, *Restatement (Second) of Judgments*, is virtually identical to the uncontroverted facts in this case. Plaintiffs gave International Genetics authority to locate cattle for plaintiffs to purchase and lease back to it. All responsibilities associated with the purchase of the cattle, including all price negotiations with the owners of the cattle, were delegated by the plaintiffs to International Genetics. Additionally, in the Bovine Lease Agreement plaintiffs, through their representative Walter Gribben, authorized International Genetics to defend them from and against any claim relating to the ownership of the cattle and invested International Genetics with the authority to keep the cattle free and clear of adverse claims. As set forth in § 41 of the *Restatement*, the effect of a person conferring upon another the authority to act for

---

**9.** Plaintiffs admitted paragraph 10(15) as above stated on page 1 of plaintiffs' cross-fire. On page 2, however, plaintiffs apparently denied that paragraph. We state the conclusion as our own independent conclusion of law if plaintiffs intended to deny rather than admit that particular paragraph.

and on his behalf is equivalent to participation by the person conferring the authority. Therefore, the authorization of International Genetics to defend the plaintiffs against any claim relating to the ownership of the cattle and to keep the cattle free and clear of adverse claims was equivalent to participation by the plaintiffs themselves in the New York action.

■ 14. Although we have concluded that plaintiffs are precluded by the New York judgment on res judicata grounds, it is appropriate that we also rule the statute of frauds question that the parties have briefed and submitted for decision pursuant to the procedures agreed upon when the case was called for hearing on October 23, 1985. For the parties agreed at that time that the deposition testimony of the various witnesses identified by the defendant may be considered as the trial testimony of the particular witness whose deposition testimony was so designated.

15. Plaintiffs proposed only one conclusion of law in regard to the statute of frauds question. That conclusion of law stated that the "Statute of Frauds does not apply to the purchase of the cattle referred to in plaintiffs' petition because the payment for the cattle had been received and accepted by the defendant." (Paragraph 5 of plaintiffs' suggested findings of fact.) Quite apart from the fact that the legal question presented was one that could have been litigated in the New York action, we find and conclude that the plaintiffs' position in regard to the statute of frauds is untenable and we accordingly refuse to adopt plaintiffs' proposed conclusion of law.

16. Section 2–201 of the Uniform Commercial Code, as adopted in both New York and Missouri, provides that a contract for the sale of goods for a price of $500.00 or more is not enforceable unless there is some writing, signed by the party to be charged or his agent, sufficient to indicate that a contract for sale has been made between the parties or unless payment for the goods has been made and accepted.

17. We conclude under the findings of fact above stated that no writing was ever signed by Lucky Star sufficient to indicate a sale of the cattle at issue to International Genetics. We further find and conclude that the circumstances relating to the $50,-000.00 cashier's check and the alleged $110,000.00 promissory note did not establish a contract of sale outside the statute of frauds.

We recognize that plaintiffs proposed in paragraph 25 of their suggested findings of fact that we find that at some unspecified time "defendant's attorney, Raymond Maguire, was aware that Henry Holt had disappeared and that he was being sought by the FBI, his staff was looking for their salary, and the office furniture from the International Genetics office in California had disappeared." That factual circumstance, assuming it be true, when considered in light of the "very strange" circumstances under which the $50,000.00 cashier's check was delivered to defendant's attorney Maguire, supports our finding and conclusion that Lucky Star was insisting on a written contract of sale of the cattle as required by the statute of frauds.[10]

18. The parties have stipulated that no writings were signed by International Genetics or Hollow Circle Holsteins which indicated that a contract for sale of the cattle at issue was made between them. Plaintiffs contend, however, that an alleged oral contract between International Genetics and Hollow Circle Holsteins was enforceable outside the statute of frauds because Jay Roebuck paid $98,268.00 for cattle purchased from International Genetics. It is undisputed that the $98,260.00 was part of the proceeds of a $142,600.00 cashier's

10. As we have already indicated, the question of Lucky Star's right to retain the proceeds of the $50,000.00 cashier's check is not ruled in this case. It is further obvious that such a question was not ruled in the New York litigation. The New York case simply ruled that Lucky Star was entitled to the cattle; it did not rule that Lucky Star was also entitled to retain the $50,-000.00 cashier's check.

check sent by Gribben to Hollow Circle Holsteins for the purchase of 200 head of cattle, which 200 head did not include any of the cattle that are at issue in this action. (Paragraph 21, Joint Stipulation.) We therefore find and conclude that the alleged oral contract between International Genetics and Hollow Circle Holsteins was not rendered enforceable outside the statute of frauds by virtue of payment of the $98,260.00. Under the undisputed facts, the $98,260.00 was paid by the plaintiffs for the purchase of cattle *other* than the cattle alleged to be the subject matter of the alleged oral contract between International Genetics and Hollow Circle Holsteins.

19. We further conclude the fact that Gribben may have "mistakenly believed that the funds sent to Hollow Circle Holstein ... was for the purchase of the cattle in question," as plaintiffs proposed we find in their November 15, 1985 supplemental request for findings of fact, even if true, is immaterial to the question of whether the statute of frauds bars plaintiffs' claim.

### IV.

For the reasons stated, it is

ORDERED (1) that defendant's motion for summary judgment should be and the same is hereby granted. It is further

ORDERED (2) that the Clerk, pursuant to Rule 58 of the Federal Rules of Civil Procedure, set forth and enter judgment for the defendant on a separate document.